SHORE, For and On Behalf of NATIONAL LABOR RELATIONS BOARD v. BUILDING & CONSTRUCTION TRADES COUNCIL OF PITTSBURGH, PA., et al.

No. 9823.

United States Court of Appeals
Third Circuit.

Argued Feb. 23, 1949.

Decided March 4, 1949.

WALLER, Circuit Judge, dissenting.

———◆———

J. Alfred Wilner, Thomas E. Whitten, Bernard Kaplan, Arnold D. Wilner and George C. Mantzoros, all of Pittsburgh, Pa., for appellants.

Winthrop A. Johns, Robert N. Denham, Gen. Counsel, David P. Findling, Associate Gen. Counsel and William W. Kapell, Atty., all of Washington, D. C., for appellee.

Before GOODRICH, WALLER and Mc-LAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal by five labor organizations from an injunction given against them by the District Court to restrain certain alleged unfair labor practices. The injunction was given pursuant to Section 10(l) of the Labor-Management Act of 1947, better known as the Taft-Hartley Act.[1] At the outset the appellants challenge the jurisdiction of the court because, they say, the facts of the case do not present anything within the power of Congress to regulate.

So far as the jurisdictional aspects of the facts are concerned they are subject to little dispute and may be briefly stated.

The Dill Construction Company (Dill) was the general contractor for the construction of an open-air drive-in theater in Bridgeville, Pa. The electrical work was subcontracted by Dill to a partnership firm known as Petredis and Fryer. This firm has brought the charge here in question. It is to be noted that the customer was a Pennsylvania customer, the construction that of a local theater, and the general contractor and the sub-contractor here involved were Pennsylvania business concerns. How, then, does the Taft-Hartley Act have anything to do with the matter?

On behalf of the National Labor Relations Board it is pointed out that in this Act, as in the Wagner Act, 29 U.S.C.A. § 151 et seq., Congress has endeavored to exercise the commerce power given to it under the Constitution, art. 1, § 8, cl. 3, so far as that power will reach.[2] Not only are labor practices which occur during the actual conduct of interstate commerce regulated, but regulation is likewise extended to certain acts which may "affect" interstate commerce.[3] In the past decade the Supreme Court has told us in a series of decisions applicable to various aspects of federal legislation, how wide the power under the commerce clause is.[4] Artificial divisions previously established between such things as production, manufacturing and transportation have been swept away. And, as Mr. Justice Frankfurter pointed out in the Polish National Alliance case, what affects interstate commerce is a matter of practical judgment.[5]

On behalf of the Board there was evidence here produced to the effect that 90% of the Dill Company's business is the building of commercial and industrial projects. In 1948 one third of the materials bought by it through local suppliers originated in states other than Pennsylvania. Some of these materials were purchased specifically for use on this Bridgeville theater project. Figures were also given of the proportion of the out-of-state supplies which were bought by the suppliers themselves. The same was shown for Petredis and Fryer, the complainants in the present litigation.

[1] "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(b) the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any district court of the United States * * * for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter." 29 U.S.C.A. § 160(l).

[2] Polish National Alliance v. National Labor Relations Board, 1944, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509.

[3] "(7) The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." 29 U.S.C.A. § 152(7).

[4] Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996; Polish National Alliance v. National Labor Relations Board, 1944, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509; Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122; National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

[5] 1944, 322 U.S. 643, 648, 64 S.Ct. 1196, 88 L.Ed. 1509.

It was likewise shown that certain out-of-state supplies were shipped directly to the Bridgeville theater from various points to be used in its construction. The Board points out to us, likewise, that according to the latest available figures, 53% of the establishments engaged in the construction industry did an annual business of less than $5,000 for each establishment.[6] It was likewise pointed out that in 1946 the total value of new construction in the United States was over $10,000,000,000.[7]

All of this argument adds up to the conclusion that what affects the building industry in a given community affects interstate commerce and that the total effect of a $10,000,000,000 industry on interstate commerce is obviously very appreciable. One small stoppage may not have an immediately perceptible effect upon the flow of the whole stream. But many small stoppages will have such effect. And like the small amount of grain in Wickard v. Filburn,[8] the power to regulate is not lost because of the small size of any individual contribution. We reach the conclusion that it cannot be denied that Congress may, through its power to regulate what affects interstate commerce, regulate labor practices in industries which are themselves dependent on interstate commerce. That Congress has done so in the Act regulating labor relations is established.[9] There is no escape, therefore, from the answer that the power is there and Congress has chosen to exercise it.[10]

We pass, therefore, to the question whether there is sufficient here to justify the issuing of the injunction, it being clear that the court has power to do so in a proper case. It is to be noted that the District Court was not required to find the charges made to be true, but to find reasonable cause to believe them to be true. Our function is, of course, not to find that the charges made are true or untrue, but to determine whether the court was clearly erroneous in finding reasonable cause to exist.

There was evidence to indicate the following facts. The employees of the electrical contractor, Petredis and Fryer, were members of the United Construction Workers which is a branch of the United Mine Workers of America. The other subcontractors employed members of A. F. of L. building trades unions and it is the carpenters and sheet metal workers with whom we are concerned here. Two carpenters and one sheet metal worker were at work on this job on August 30, 1948. On that day a Mr. Hackett, the business agent for Local No. 5 of International Brotherhood of Electrical Workers, an A. F. of L. union, appeared at the theater site and questioned the workmen on the job. The net effect of his conversations with the carpenters and the sheet metal worker was that they left the job after consulting the business agents of their respective unions, and no further work was done for at least three days thereafter. The reason for the work stoppage

---

[6] Sixteenth Census of United States: Census of Business, 1939, vol. IV (Construction) p. 17 (U. S. Dept. of Commerce, Bureau of Census, 1943).

[7] Construction and Construction Materials: Dollar Construction Estimates, 1915–46, p. 36 (U. S. Dept. of Commerce, Bureau of Foreign and Domestic Commerce, Statistical Supp. May 1947).

[8] 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L. Ed. 122. The case involved enforcement of the marketing provisions of the Agricultural Adjustment Act, 7 U.S.C.A. § 1281 et seq., against a farmer who produced 239 bushels of wheat above his quota.

[9] Polish National Alliance v. National Labor Relations Board, 1944, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509; National Labor Relations Board v. Fainblatt, 1939, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

[10] The Tenth Circuit has so held in the only case involving the construction industry which has been decided by a Court of Appeals under the Taft-Hartley Act. United Brotherhood of Carpenters v. Sperry, 10 Cir., 1948, 170 F.2d 863. The same provisions of the Act §§ 8(b) (4) (A) and 10(l) have been enforced in a decision of the Ninth Circuit, Printing Specialties and Paper Converters Union v. Le Baron, 9 Cir., 1948, 171 F.2d 331. The scope of the Act was not disputed in the latter case.

was the fact that the A. F. of L. unions refused to recognize the non-A. F. of L. union men working for Petredis and Fryer.

We think it clear that the District Court was not in error in concluding that there was reasonable ground that there was coercion. There is evidence that Hackett asked Tyler, the sheet metal worker, if he was going to continue to work on the job with "this electrical firm." Tyler replied, "Not if it means I have to pay a fine." Whereupon Hackett suggested that Tyler call his own business agent. Tyler did so and then left the job. Similar action was taken by the carpenters. We think that coercion may be found in the relationship between the union officers and the men on the job. We think it is clear, also, that all three men could have been found to have left the job before the conclusion of the day's work and that the cessation of work for three days thereafter constituted a concerted refusal to work.

The case is not moot. It is true that the construction of the theater has long since been completed. But there is reasonable ground for belief that there was an unfair labor practice. The defendants say that they are not legally liable for doing what they did and certainly indicate no lack of intention to do the same thing in the future. It is clear as a general proposition of equity that the granting of an injunction is not foreclosed because the act feared has already happened, if there is reasonable grounds for believing that it will be done again.[11] And the defense that there is no longer need for an enforcement order because the complained of practices have, at least temporarily, ceased is one that has been threshed out many times in labor cases where it was the employer and not the union who made the point.[12] The current of authority is pretty uniform in rejecting this reason for refusing relief. Those decisions are in point here.

Appellants' final point is that there is no evidence in the record to support the injunction against the Building and Construction Trades Council of Pittsburgh and the International Union of Operating Engineers, Local No. 66, 66-A, 66-B and 66-C. As to the Council, we think the record shows reasonable cause to believe that it was concerned in the practices here complained of. The A. F. of L. unions for the carpenters, sheet metal workers, electricians and operating engineers are all members of the Council. The business agent for the electricians, in arranging for the meeting with Mr. Ridilla, the general contractor, after the work stoppage, told him that the Building Trades Council wanted to meet with him. At the meeting the business agents of the above unions were present. We think that the participation of these constituent unions in the conference and work stoppage in the name of the Council is sufficient to show reasonable cause for believing the Council was involved in the matter.

Similarly the participation of the business agent of the Operating Engineers is sufficient basis for including that union as a party defendant, whether or not there was a direct work stoppage on the part of the shovel operator at the theater job. Mr. Mangold, business agent of the Operating Engineers, was at the September 3 meeting, at which the general contractor and representatives of the trades unions were present. As pointed out before, we do not at this stage pass upon the question of whether any of these defendants have been guilty of unfair labor practices. We only decide that the District Court was not clearly erroneous in concluding that there were reasonable grounds to believe such practices had taken place. It may be added that the complaint about the inclusion of the Building Trades Council and the Operating Engineers was not made in the court below either before or after the decree was en-

11 28 Am.Jur., Injunctions §§ 6, 7, (1940); Restatement, Torts § 935, comment b (1939).
12 National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed.

831, Note, 115 A.L.R. 307. See Independent Employees Ass'n v. National Labor Relations Board, 2 Cir., 1946, 158 F.2d 448; National Labor Relations Board v. Toledo Desk & Fixture Co., 6 Cir., 1946, 158 F.2d 426.

tered. The raising of the point thus bears evidence of being an after-thought on the part of the defendants.

The order appealed from will be affirmed.

WALLER, Circuit Judge (dissenting).

The controversy arose over whether the employees of the Petredis and Fryer electrical sub-contractors, engaged in wiring a movie theatre, should be discharged from the job by the general contractor because those employees were members of an independent union, or a union not affiliated with the A. F. of L. unions to which the employees of other contractors belonged.

Petredis and Fryer were the sole complainants before the Board against the several unions. The theatre owner, the main contractor, the other sub-contractors, the suppliers of materials to the contractor and sub-contractors, were not brought in either as complainants or respondents. So the simple question involved is what would have happened to interstate commerce if the employees of Petredis and Fryer had, or had not, been "pulled off the job" and if the carpenter and his helper and the sheet metal worker had continued to refuse to work during the few days remaining before completion of the job.

In an effort to make a showing of substantiality in the interstate commerce alleged to have been affected, the Board was not content to rest upon the effect on interstate commerce that would be achieved by a discharge of Petredis and Fryer as sub-contractors or, that is, the amount of interstate commodities which Petredis and Fryer would thereafter require in completion of the wiring of the theatre; but in order to undertake to sustain its jurisdiction, the Board deemed it appropriate to aggregate not only the amount of supplies originating out of the state and purchased by Dill and the several sub-contractors, but it also undertook to cumulate the supplies originating out of the state purchased by all of the merchants and suppliers of Dill and the sub-contractors. The Board was not content to rely upon the interstate supplies used in the theatre job purchased by the general and sub-contractors, nor the amount

of the supplies of the merchants sold for the theatre job, but it also included all such supplies purchased by the sub-contractors or suppliers for any purpose or any use during the entire year, 1948, and without consideration of the fact that any effect upon interstate commerce of the commodities already put into the nearly completed theatre was water over the dam. I cannot conceive that the interstate commerce in goods not used in the theatre job, or goods already placed in the job, or goods already delivered to the job, or goods used in some other job without the scope of the labor controversy here, could be substantially affected by the fact that a carpenter, his helper, and a sheet metal worker declined to work with the employees of the electrical sub-contractor. The dragging in by the Board of all of the materials purchased, regardless of time or use by the contractor, the sub-contractors, and the merchants who sold to the contractor and sub-contractors during an entire year is comparable to a razor back sow, which, in making her bed in the woods, indiscriminately rakes together all the available vegetation, leaves, sticks, and straw, into a pile large enough to allow her to take refuge therein.

To include the purchasers of local merchants who sold material during the year to the general and sub-contractors is, in my humble judgment, too remote, and if the interstate commerce of merchants who are wholly disconnected with the controversy can be accumulated in the endeavor to show substantiality, then not only every merchant employer, from Bill Grimes at the cross roads near Yellow Rabbit to John Wanamaker of Philadelphia, whose sales are derived in part from commodities acquired from out of the state, but every employer who buys from such merchant any such materials to use in the construction of any store, whether it be that of Bill Grimes or that of John Wanamaker, would be under the jurisdiction of the Board.

It seems to me unnecessary to make excursions into the chimerical in order to give the Act the reasonable and practical enforcement that should be ascribed to the intent and purpose of Congress.