**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED STEELWORKERS OF AMERICA, AFL-CIO, AND LOCAL 5246, United Steelworkers of America, AFL-CIO, Respondents.**

**No. 5237.**

United States Court of Appeals
First Circuit.

Dec. 5, 1957.

Arnold Ordman, Washington, D. C., with whom Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., were on brief, for petitioner.

James McC. Harkless, Boston, Mass., with whom Robert D. Manning and Grant & Angoff, Boston, Mass., were on brief, for respondents.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

■ This petition for enforcement of an order of the National Labor Relation Board presents questions with respect to the application of the so-called "secondary boycott" provision embodied in § 8(b)(4)(A) of the Labor Management Relations Act, 1947, known as the Taft-Hartley Act, 61 Stat. 141, 29 U.S. C.A. § 158(b)(4)(A), quoted as far as material in the margin.[1]

The facts are virtually undisputed. For present purposes they may be briefly summarized as follows:

The respondents, referred to hereinafter collectively as the Union, is the duly certified bargaining representative of well over 100 production and maintenance workers employed by Barry Controls, Inc., at its plant in Watertown, Massachusetts, where it manufactures shock absorbers of one kind or another. The Union called a strike of these employees in January, 1956, and lawful picketing of the employer's plant ensued. In addition, the Union detailed pickets to follow a truck driver, one Yorke, who although a member of the bargaining unit did not go out on strike, and to picket his truck when he made stops in the course of picking up materials from and making deliveries to other employers in the area. Specifically this picketing occurred at the terminals in the adjoining city of Cambridge, Massachusetts, of three interstate motor carriers used by Barry to transport its products to customers, and at the premises, also in Cambridge, of a concern used by Barry and others to package goods for shipment. All of these premises, although in Cambridge, were within five or six miles of the Barry plant in Watertown.

General Counsel for the Board issued a complaint against the Union on charges filed by Barry and the complaint was processed by the Board in the usual way. The trial examiner found the facts essential to the jurisdiction of the Board and of this court, indeed those facts are conceded, and then went on to find further facts which need not be detailed here as to the character of the picketing of Yorke's truck. On the basis of the evidence as to the manner in which that picketing was conducted he found that there was neither the intent to show nor any clear indication that the strike was against Barry only, but instead that there was both the intent and the hope that the strike would be construed as

---

[1] "(b) It shall be an unfair labor practice for a labor organization or its agents—

    \*    \*    \*    \*    \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to \* \* \* transport or otherwise handle or work on any goods, article [etc.] or to perform any services, when an object thereof is: (A) forcing or requiring any employer \* \* \* or other person to cease \* \* \* handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \*."

against the secondary employers on or near whose premises the picketing took place. Wherefore he concluded that the requirements for legal picketing on neutral employers' premises as laid down by the Board in Sailors' Union of the Pacific (Moore Drydock Company), 92 N.L.R.B. 547, had not been met. In consequence he found that the Union had been guilty of an unfair labor practice as defined in the section of the act quoted above in the margin, and he therefore recommended that the Board order the Union to cease and desist from its picketing on or near the secondary employers' places of business and to take the usual affirmative remedial action.

The Board on exceptions filed by the Union agreed with the ultimate conclusion reached by the trial examiner but not with his reason therefor. Relying for its authority upon Brewery and Beverage Drivers and Workers etc. (Washington Coca-Cola Bottling Works, Inc.), 107 N.L.R.B. 299, 302–303, enforced sub nom. Brewery and Beverage Drivers and Workers, etc. v. N.L.R.B., 1955, 95 U.S. App.D.C. 117, 220 F.2d 380; Local 657, International Brotherhood of Teamsters etc. (Southwestern Motor Transport, Inc.), 115 N.L.R.B. No. 155; and Sheet Metal Workers International Association Local No. 51 (W. H. Arthur), 115 N.L. R.B. No. 183, it said:

"We agree with the Trial Examiner that the Respondents violated Section 8(b)(4)(A) of the Act by picketing the trucks of Barry, with whom the Respondents had a labor dispute, at the terminals and the packaging plant of secondary employers on April 25, 1956. In so doing however, we, unlike the Trial Examiner, do not rely upon the Respondents' alleged failure to observe the Moore Drydock requirement that the picketing at the secondary employers' premises be conducted in a manner clearly disclosing that it was directed only against the primary employer. Apart from the fact that we believe that the Trial Examiner's finding that the Moore Drydock

standard was not met is factually incorrect, the Board has held that the Moore Drydock doctrine is inapplicable to a situation where as here the primary employer has a permanent place of business at which the union could adequately publicize its labor dispute. In these circumstances, we find, in accordance with the reasoning in Washington Coca Cola and Southwestern cases, that the fact that the picketing was conducted at the premises of secondary employers, plainly reveals that it was designed, at least in part, to induce and encourage the employees of these secondary employers to engage in a concerted refusal in the course of their employment to handle Barry's freight with an object of forcing or requiring the secondary employers to discontinue doing business with Barry and that the Respondents thereby violated Section 8(b)(4)(A) of the Act."

We agree with the Board that the Moore Drydock doctrine, so-called, has no application to the situation disclosed by the facts in this case.

That doctrine was devised by the Board to reconcile "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." N.L. R.B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284. To effect this reconciliation the Board held as follows (footnotes omitted) in a case involving the picketing of a vessel of a primary employer tied up at a secondary employer's drydock:

"When a secondary employer is harboring the *situs* of a dispute between a union and a primary employer, the right of neither the union to picket nor of the secondary employer to be free from picketing can be absolute. The enmeshing of premises and *situs* qualifies both

rights. In the kind of situation that exists in this case, we believe that picketing of the premises of a secondary employer is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs;* (c) the picketing is limited to places reasonably close to the location of the *situs;* and (d) the picketing discloses clearly that the dispute is with the primary employer."

We may concede that the Moore Drydock doctrine would have application when the primary employer has a fixed and permanent place of business, but picketing his premises by striking employees would not in any real sense adequately publicize the labor dispute. The Board clearly recognized this in the language quoted above from its decision in the case at bar, such, apparently, was the situation in N.L.R. B. v. Service Trade Chauffeurs, etc., 2 Cir., 1951, 191 F.2d 65, and it is frequently the situation in the building construction industry where more often than not most of the employees of a contractor or subcontractor are working at a building site with employees of other employers, and seldom, or only very briefly, have occasion to visit their employer's yard, warehouse, office or other headquarters. See N.L.R.B. v. General Drivers, etc., 5 Cir., 1955, 225 F.2d 205; Sales Drivers, etc. v. N.L.R.B., 1955, 97 U.S.App.D.C. 173, 229 F.2d 514, and its sequel Truck Drivers and Helpers Local, etc., v. N.L.R.B., D.C. Cir., 249 F.2d 512.

The case at bar, however, does not present the foregoing situation, for here, so far as the record shows, all of the employees in the bargaining unit were continuously employed at Barry's manufacturing plant, except Yorke and perhaps another truck driver with whom we are not concerned, and Yorke not only must frequently have had to cross the picket line at the Barry plant on his way to and from work, but he also had occasion in the course of his pick up and delivery duties to cross the picket line in his truck at least once or twice a day. Thus by picketing the premises of the primary employer, Barry, alone, the Union had a fully adequate opportunity to publicize its labor dispute to the members of the bargaining unit generally and also to exert individual pressure on Yorke by embarrassing him into either joining the strike or quitting his job. Certainly from these facts it was logical and reasonable for the Board to draw the inference that the Union's picketing of Yorke's truck at the premises of secondary employers must have been designed, in part at least, to encourage those employers to cease doing business with Barry, or to induce their employees not to handle or transport Barry's freight. Indeed the Union official in charge of the strike testified candidly on the stand that if as a result of the picketing of Yorke's truck "other people refused to handle it [Barry's freight], then, I would be less than honest if I said I was unhappy about it," and again, "if employees of other employers refused to handle the Barry material that would not make me unhappy."

Causing other employers, or their employees, to cease doing business with the primary employer does not have to be the *sole* objective of picketing on a secondary employer's premises to make the activity illegal. It is enough if that eventuality is *an* objective of the activity. N.L.R.B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 689, 71 S. Ct. 943, 95 L.Ed. 1284. Nor is it required that the forbidden objective be attained. N.L.R.B. v. Associated Musicians, etc., 2 Cir., 1955, 226 F.2d 900, 904–905.

In short, we conclude that the Board's findings of fact are amply supported by the evidence in the record considered

188

as a whole and that the inference the Board drew from the facts it found is not only logical but entirely reasonable. We may add that the result we reach is in accord with the results reached on comparable facts by the court in the case last cited, and also by the courts of appeals for the District of Columbia and the Fifth Circuit in Brewery and Beverage Drivers and Workers, etc. v. N.L.R.B., 1955, 95 U.S.App.D.C. 117, 220 F.2d 380, and N.L.R.B. v. Truck Drivers & Helpers, etc., 5 Cir., 1956, 228 F.2d 791.

A decree will be entered enforcing the order of the Board.