Bennet F. SCHAUFFLER, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

BREWERY AND BEER DISTRIBUTOR DRIVERS, HELPERS and PLATFORM MEN, LOCAL 830, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, INDEPENDENT, Respondent.

Civ. No. 24420.

United States District Court
E. D. Pennsylvania.

May 1, 1958.

⬷189

2

Joseph I. Nachman, N.L.R.B., Washington, D. C., and Stanley Brockman, N.L.R.B., Philadelphia, Pa., for petitioner.

Richard H. Markowitz, Marshall J. Seidman, Philadelphia, Pa., for respondent.

Laurence DiStephano, Jr., Philadelphia, Pa., for intervening petitioners, Delaware Valley Beer Distributors Association.

VAN DUSEN, District Judge.

This cause came on to be heard upon the petition with attached supporting affidavit of Bennet F. Schauffler, Regional Director of the Fourth Region of the National Labor Relations Board (herein called the Board), for a temporary injunction pursuant to Section 10 (*l*) of the National Labor Relations Act, as amended (herein called the Act), 29 U.S.C.A. § 160(*l*), pending the final disposition of the matters involved pending before said Board, and upon the issuance of an order to show cause why injunctive relief should not be granted as prayed in said petition. Respondent filed an answer to said petition. A hearing on the issues raised by the petition and answer was duly held beginning on April 8, 1958. All parties were afforded full opportunity to be heard, to examine and cross-examine witnesses, to present evidence bearing on the issues, and to argue on the evidence and the law. The Court has fully considered the petition, answer, evidence, and arguments and briefs of counsel. Upon the entire record the Court makes the following:

Findings of Fact.

1. Petitioner is Regional Director of the Fourth Region of the Board, an agency of the United States, and filed this petition for and on behalf of the Board.

2. Respondent Brewery and Beer Distributor Drivers, Helpers and Platform Men, Local 830, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Independent, an unincorporated association, is a labor organization within the meaning of Sections 2(5), 8(b) and 10(*l*) of the Act, and at all times material herein has been engaged within this judicial district in transacting business and in promoting and protecting the interests of its employee members.

3. On or about March 13, 1958, Delaware Valley Beer Distributors Association (herein called Association), pursuant to the provisions of the Act, filed a charge with the Board alleging that respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b), subsection (4) (A) of the Act.

4. Said charge was referred to petitioner as Regional Director of the Fourth Region of the Board for investigation, and was investigated by petitioner and under his supervision.

5. There is and petitioner has reasonable cause to believe that:

(a) Association is composed of approximately 27 members each of whom is engaged in the distribution of beer in the City of Philadelphia.

(b) C. Schmidt and Sons, Inc. (herein called Schmidt), Harry F. Ortlieb Brewing Company (herein called Ortlieb), Esslingers, Inc. (herein called Esslinger), and William Gretz Brewing Company (herein called Gretz), and herein collectively called the Brewers, are each engaged within the Eastern District of Pennsylvania in the manufacture and sale of beer and related malt products. During the past year Schmidt, Ortlieb, Esslinger and Gretz each sold and shipped beer and related products valued at in excess of $50,000 directly from their respective plants in the Eastern District of Pennsylvania, to points and places outside the Commonwealth of Pennsylvania.

(c) Scott and Grauer, Antonio Origlio (herein called Origlio), Smiler Beverage Company (herein called Smiler), and herein collectively called Importing Distributors, are engaged at Philadelphia, Pennsylvania, in the sale and distribution of beer. During the past year Scott and Grauer purchased and caused to be shipped beer valued at in excess of $500,000 to their respective establishments in Philadelphia, Pennsylvania, directly from points and places outside the Commonwealth of Pennsylvania.

(d) Members of the Association purchased the beer which they distribute and sell in the City of Philadelphia from

the Brewers referred to Findings of Fact (b), and from Importing Distributors such as Scott and Grauer, Origlio and Smiler.

(e) Since on or about March 1, 1958, respondent has been engaged in a labor dispute with members of Association over the wages, hours and other terms and conditions of employment of the employees employed by members of Association.

(f) In furtherance and support of the labor dispute referred to in Finding of Fact 5(e) above, since on or about March 10, 1958, respondent has on occasions picketed at the premises of some of the Brewers and Importing Distributors referred to in Findings of Fact 5(b) and (c) above, when a truck of a member of Association came to the premises of said Brewers or Importing Distributors to pick up beer, thereby appealing to the employees of such Brewers and Importing Distributors not to load beer on the trucks of such members. (N.T. 121, 195–198, 200 & 214 re March 18, N.T. 176–177 re March 26 and N.T. 71 ff. re April 7).

(g) In addition thereto, since on or about March 10, 1958, respondent has ordered, directed, instructed and appealed to the employees of Schmidt, Ortlieb, Esslinger, Gretz, Scott and Grauer, Origlio and Smiler not to load the trucks of members of Association, or to deliver beer to members of Association, as a result of which members of Association have been cut off from their supply of beer. See pages 3–7 of Attached Discussion [post, p. 7].

(h) By their acts and conduct set forth in Findings of Fact 5(f) and (g) above, and by other means, respondent has engaged in, and has induced and encouraged the employees of Schmidt, Ortlieb, Esslinger, Gretz, Scott and Grauer, Origlio, Smiler, and of other employers, to engage in, strikes or concerted refusals in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on goods, articles, materials or commodities or to perform services.

(i) An object of respondent's acts and conduct set forth in Findings of Fact 5 (f), (g) and (h) above, was and is to force or require Schmidt, Ortlieb, Esslinger, Gretz, Scott and Grauer, Origlio, Smiler, and other employers and persons to cease doing business with members of Association.

(j) The facts stated on pages 1–6 of attached discussion [post, p. 6].

6. The acts and conduct set forth in Findings of Fact 5(f) through 5(i) above, occurring in connection with the operations of Schmidt, Ortlieb, Esslinger, Gretz, and Scott and Grauer, have a close, intimate and substantial relation to trade, traffic and commerce among the several states and tend to lead and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce. All the secondary employers named in the petition were victims of a pattern of unfair labor practices.

7. It may be fairly anticipated that, unless restrained, respondents will repeat or continue the acts and conduct set forth in Findings of Fact 5(f), through 5(i) above, or similar or like acts and conduct.

8. The following paragraphs of respondent's Requests for Findings of Fact are affirmed: 1, 2, 5, 6, 9, 11, 13, 17, 19, 22, 24, 25, 29, 30, 33, 39, 41–44, 46, 47, 50–53, 55, 56, 58, 63–65, 72, 75 and 76.

9. The following paragraphs, and parts of paragraphs, of respondent's Requests for Findings of Fact are affirmed as modified below:

First sentence of paragraph 4; second sentence of paragraph 5; 8, with insertion of "fairly" before "common" in line 1; 12, with the exception of the 4th sentence and with the insertion of the words "in 1957" at the beginning of the 3rd, 5th, and 6th sentences; 20, with the 3rd sentence modified to insert "all" after the word "represent" and with the addition of these words at the end of the sentence: "but may represent some

of these dock employees"; 21, with the insertion before the word "have" in line 2 of "(about 20)" and with the insertion at the beginning of the 2nd sentence of the words "the charge also alleges that"; 27, with the elimination of the second sentence; 28, with the substitution of "most" for "practically all" in the 1st sentence and with the substitution of these 2 sentences for the 2nd sentence: "He is in the store about 2 hours a day. During weekend his wife is in the store and quite a few customers pick up merchandise in the store on Fridays and Saturdays."; 36, reworded as follows: "Mr. Origlio ordered three of his men to start loading Mr. Miller's truck. After the first of these men refused and the second hesitated before refusing, Mr. Origlio asked Mr. Basal 'What are we going to do about this?' Mr. Basal replied to Mr. Origlio, 'Well, those men should load the truck.' The three men (a union steward and two others) refused to load the truck and were discharged immediately by Mr. Origlio. Mr. Basal did not order these men to load the truck and he made no protest concerning the discharge of these employees for refusing to load Mr. Miller's truck (N.T. 62 ff.)."; 40, with the words "but were members of another union" added at the end; 54, with the insertion of "approximately" before "25" and of "since March 10, 1958" after "signed"; 57, with the insertion of "present" after "membership"; 60, with the words "almost all of" at the beginning of the second sentence; 71–A, with the elimination of the words "particularly, to be sure" from the second sentence; 73, with the elimination of the last sentence; 74, with the insertion after "distributors" in the 1st line of ", listed in the appendix to Delaware Valley's charge attached to the petition," and with the substitution of "Cicchiani" for "Cicchini"; 77, with the elimination of "only" in the 1st line and the substitution of "which was the most important part of the material to which" for "that" in line 3 and with the insertion of "was" after "to" in the 4th line; 78, with the insertion in line 4 after "do" of ", if only their business was involved," and with the elimination of "any of" in that line.

All other Requests for Findings of Fact are denied.[1]

### Conclusions of Law.

1. This Court has jurisdiction of the parties and the subject matter of this proceeding, and under Section 10*(l)* of the Act, has jurisdiction to grant injunctive relief. See Discussion attached [post, p. 6].

2. Respondent is a labor organization within the meaning of Sections 2(5), 8(b) and 10(*l*) of the Act.

3. There is reasonable cause to believe that:

(a) Schmidt, Ortlieb, Esslinger, Gretz, and Scott and Grauer, are engaged in commerce within the meaning of Section 2, subsections (6) and (7) of the Act.

(b) Respondent has engaged in unfair labor practices within the meaning of Section 8(b), subsection (4) (A) of the Act, and affecting commerce within the meaning of Section 2, subsections (6) and (7) of the Act, and that a continuation of these practices will impair the policies of the Act as set forth in Section 1(b) thereof.

---

1. In passing on these respondent's Requests, the hearing judge has had to take into consideration failure of Mr. Lanni to deny the testimony of Mr. Miller that Mr. Lanni made this statement to him in March 1958 (N.T. 85):

> "You are not going to get any beer anyway, even if you get an injunction. * * As far as I am concerned, it might as well be on toilet paper."

Mr. Lanni was on the stand subsequent to this testimony and the testimony of any person who fails to promptly deny such a statement about the decrees of his country's courts should certainly be scrutinized with caution and care. It is also noted that Mr. Lanni testified that he did not send messages to the members of the Union through his shop stewards (N.T. 25–6), although the Union President testified that he would get in touch with the unionized employees through the shop stewards (N.T. 46–7).

See pages 6–14 of the Discussion attached hereto [post, p. 8].

4. To preserve the issues for the determination of the Board as provided in the Act, it is appropriate, just and proper that, pending the final disposition of the matters involved herein pending before the Board, respondent, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with it or them, should be enjoined and restrained from the commission and continuation of the acts and conduct set forth above, acts or conduct in furtherance or support thereof, and like or related acts or conduct, the commission of which in the future is likely or may be fairly anticipated from respondent's acts and conduct in the past. See Discussion attached [post, p. 6].

Respondent's Requests for Conclusions of Law are denied.

### Discussion.

After the termination of the hearings late on the afternoon of April 10, 1958, respondent requested and was granted permission to file its brief on April 23, 1958.[1]

### A. Facts.

There is, and petitioner has, reasonable cause to believe the following paragraphs:

Respondent Local 830 had 3-year contracts with both importing distributors (referred to in the testimony as ID— N.T. 287 ff.) and domestic distributors (referred to in the testimony as D or DD) expiring on September 30, 1957. Negotiations for renewal of the contract with the domestic distributors commenced in September 1957, and by December 1957 most, if not all, of the terms of that contract had been agreed upon between the representatives of the respondent and those of the domestic distributors. The latter were represented in September 1957 by the Philadelphia Beer Distributors Association (hereinafter called "Philadelphia"), but in the winter of 1958 several of these distributors, being dissatisfied with the negotiations,[2] withdrew from Philadelphia and formed the Delaware Valley Beer Distributors Association (hereinafter called "Delaware Valley"), which filed the charges leading to the institution of this suit. Although the agreements between some of the distributors who are now members of Delaware Valley and Philadelphia authorized the latter to "negotiate" and "execute, in the name and in behalf of the Member, any and all contracts * * *," these documents were dated at various times between 2/11/46 and March 1957 (N.T. 446–7), and, in practice, the association never signed a union contract on behalf of its members, but these members signed their own contracts with the union (N.T. 327 and 406). Each member had the right at any time to negotiate for himself and he was not bound by the negotiations of the association.[3]

---

1. See letter of April 14, 1958, attached to this Discussion. On April 17, respondent asked permission to file its brief at 5:30 p. m. on April 23 and such permission was granted.

2. The Montgomery, Delaware & Chester County Distributors negotiated a separate contract with "Local 830" when it became apparent that their interests, particularly on the subject of part-time employees, differed from those of the Philadelphia group.

3. The representatives of Philadelphia, called by the respondent, testified as follows at N.T. 332–4:

"A. Well, sir, I think anybody at any time could have negotiated by themselves. We had never taken the position that we had the sole right, even though we had the power of attorney. I mean it has happened.

"Q. In other words, you never have and still do not take the position that what you did when you signed that contract was in any way binding on all the members of the Association?

\* \* \* \*

"A. That is why they sign it individually, and we do not sign it as the Association. That is one of the weaknesses of our negotiations. I cannot come into the negotiations saying that I have 400 people, just as the Union comes in and says that it has all the employees.

About March 10, respondent union first issued cards to the drivers of the retail domestic distributors who had signed the 1957 contract, saying "OK" or "OK to load" (P–1), and a few days later over 200 posters (also called signs), designed to be placed by such drivers in the cabs of their trucks, bearing the legend "Signed up with Local 830," were distributed in place of the cards (N.T. 28–32, 35, 45, 123–6). The President of Local 830 (respondent), who distributed the cards and the posters, knew that trucks, including those of members of Delaware Valley, which did not have the sign or the card, were not being loaded by the employees of the breweries and independent distributors (secondary employers) (N.T. 47–8, 170). With this knowledge, the respondent continued to give out the cards and posters to domestic distributors who signed the 1957 contract (N.T. 38). He also sent messages to the employees of the independent distributors that they should not load the domestic distributors' trucks unless they had a card with the "OK" of the union on them or a poster (N.T. 170–1).

On both March 18 and April 7, the employees of Esslinger refused to load the truck of Copenhagen Castle Beer Distributing Company of Phila., Inc., (a member of Delaware Valley) at the direction of respondent (N.T. 68–78). On March 18, Mr. Lester Parker (respondent's shop steward) said to Esslinger's shipping clerk, when the owner of Copenhagen came for beer: "This guy gets no beer" (N.T. 69). On April 7, Mr. Parker put picket signs on individuals who paraded in front of a truck of a Delaware Valley member (Queen Bee) and Copenhagen was unable to get beer at Esslinger's on that day (N.T. 71–8).

On March 11, Frank Barrett, who operates his own business as a domestic distributor, without any employees, went to the Union Hall as the result of a phone call. After indicating he would probably sign the 1957 union contract, he was given a card by Mr. Grubb (union business agent) saying "OK" and told "You can go to the breweries for the next two days and pick up all the beer you want" (N.T. 113). He then went to Schmidt's and was asked by respondent's shop steward if he "had an OK card." When he showed the card, the shop steward said "OK" and he received the beer (N.T. 114). At the direction of the respondent's President and the shop steward, Barrett was unable to get beer at Ortlieb's on the same day (N.T. 115–7) because he had not signed the 1957 union contract. He then went to Esslinger's, where respondent's shop steward first asked to see his card from the union and then directed his fellow workers to load the beer (N.T. 118).

On March 18, respondent's shop steward at Esslinger's told his fellow employees not to load the truck of Mr. DiRosa (a domestic distributor) because he did not have one of the above-mentioned posters for the window of the door of his cab (N.T. 174–6). About March 26, Mr. DiRosa was refused beer at Esslinger's because the above-mentioned shop steward was picketing there (N.T. 176–7).

On March 19, respondent's shop steward at Gretz told a fellow employee not to load the truck of Mr. DiRosa until he got a poster in the window of his truck cab (N.T. 177–181).

On March 18 (N.T. 206), Mr. Sizer (general manager of Queen Bee—a domestic distributor) heard respondent's steward at Esslinger's ask for the President or Secretary of the respondent on the phone and then put on picket signs and parade with such signs in front of the trucks of domestic distributors who had not signed the 1957 union contract. The sign contained the wording "Beer Distributors on Strike" and "Delaware

"By Mr. Nachman:
"Q. Well, I take it, then, that the answer to my question was yes, you do not take that position? A. We do not take that position, and the practice indicates that they do sign individually."

Valley Beer Distributors Association," as well as other wording (N.T. 195–8, 200, 214). Before making this call, the steward said to Mr. Sizer, "Unless you have a contract, you don't get no beer." However, Mr. Sizer did get his beer on this occasion before the steward started to picket (N.T. 196, 199–201).

Mr. Sizer had such difficulty getting beer from his regular sources between March 10 and April 7 that he had to get up at 3 a.m. and travel 180 miles to secure beer to supply to his customers (N.T. 211).

Mr. Stukes (a domestic distributor) was unable to get beer at Origlio's on the afternoon of April 3 as a result of respondent's influence on the employees (N.T. 221–4, 226, 234–6).

The employees of the domestic distributors spent far more time at their employers' places of business than at the places of business of any one brewery or importing distributor. The most feasible place to reach the employees of the domestic distributors through picketing was at the places of business of such distributors.

The intent and purpose of the picketing on March 18, March 26, and April 7 was to influence and persuade the platform employees (as opposed to the employees of the domestic distributors) not to load the trucks of the domestic distributors mentioned above.

## B. Law.

The terms under which a proceeding such as this is before this court are stated in Schauffler v. Highway Truck Drivers & Helpers, 3 Cir., 1956, 230 F.2d 7, 9. See, also, Douds v. Wood, Wire & Metal Lathers Intern. Ass'n, 3 Cir., 1957, 245 F.2d 223.

4. See 10(a), Taft-Hartley Act (29 U.S. C.A. § 160(a)).

5. Polish Nat. Alliance v. National Labor Relations Board, 1944, 322 U.S. 643, 648, 64 S.Ct. 1196, 88 L.Ed. 1509.

6. Respondent's Answer to Petition for Injunction 6(b) and (c).

## 1. *Interstate Commerce (Jurisdiction)*

The activities complained of must affect interstate commerce in order to bring them within the jurisdiction of the Board.[4] In this case, the Regional Director concluded that there is reasonable cause to believe that the unfair labor practices charged affect commerce by interrupting and tending to impede and disrupt the business of a number of concerns engaging in the brewing and distribution of beer. There is nothing in the record to show that the Director's finding of reasonable cause was unwarranted. Each of four breweries involved during the past year sold and shipped beer and related products valued at more than $50,000 from its plant to places outside of Pennsylvania. One of the importing distributors purchased and caused to be shipped beer valued at in excess of $500,000 to its establishment in Philadelphia, Pa., from points and places outside that Commonwealth.[5]

Congress gave the Board authority to prevent practices tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce and, therefore, left it to the Board to ascertain whether prescribed practices would, in particular situations, adversely affect commerce when judged by the full reach of the constitutional power of Congress.[6]

The minimum jurisdiction standards of the Board are set forth in Jonesboro Grain Drying Cooperative, 110 N.L.R.B. 481 (1954). If the business of the secondary employer is to be considered on its entirety, the four breweries named in the petition meet the jurisdictional requirements under the Direct Outflow Standard[7] and one of the importing dis-

7. Jonesboro Grain Drying Cooperative, supra, at pp. 483, 484, *"Direct Outflow Standard:* An enterprise which produces or handles goods and ships such goods out of state, or performs services outside the state in which the enterprise is located, valued at $50,000. or more."

tributors, Scott & Grauer, meets the Direct Inflow Standard.[8]

In secondary boycott cases, the Board has said, in the McAllister Case, 110 N.L.R.B. 1769, 1772 (1954): "It is not the particular business between the primary employer and the secondary employer at the location affected, but rather the entire business of the secondary employer at that location that governs in applying the Board's jurisdictional standards." Clearly, then, the four named breweries and Scott & Grauer (an importing distributor) come within the jurisdiction of the NLRB. The activities at Origlio's and Smiler Beverage Co. also are protected by the NLRA under the decision in the case of Teamsters and Euclid Foods, Inc., 118 N.L.R.B. No. 17 (1957),[9] since there is reasonable cause to believe that all the secondary employers were victims of a pattern of unfair labor practices.

The hearing judge has concluded that the application of these Board decisions is required on this record in the light of appellate federal court decisions such as N. L. R. B. v. Jones & Laughlin Steel Corp., 1936, 301 U.S. 1, 41–42, 57 S.Ct. 615, 81 L.Ed. 893; Shore v. Building & Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 680, 8 A.L.R.2d 731;

cf. N. L. R. B. v. Denver Bldg. Council, 1951, 341 U.S. 675, 683–685, 71 S.Ct. 943, 95 L.Ed. 1284; Local 74, United Brotherhood of Carpenters Union v. N. L. R. B., 1951, 341 U.S. 707, 712, 71 S.Ct. 966, 95 L.Ed. 1309.

2. *Alleged Unclean Hands*

The respondent has argued that the preliminary injunction should not issue because the equitable maxim that he who comes into equity must come in with clean hands in order to obtain relief is applicable in this proceeding. The respondent union has accused some of the charging parties of inequitable behavior during the hearing in this matter and has also filed unfair labor charges against them with the National Labor Relations Board.[10]

Injunctive relief is traditionally equitable in nature. If the proceedings at issue were governed only by common law equitable rules and the defense of unclean hands were raised, the court would take into account that the defense is only applicable where there is unconscionable conduct and an adequate showing of corrupt intent,[11] that the maxim is not applicable where an inequitable result would be reached by following it,[12] and that one who comes into a court of equity is not required to come in with

8. Jonesboro Grain Drying Cooperative, supra, at p. 483: *"Direct Inflow Standard:* An enterprise which receives goods or materials from out of state, valued at $500,000. or more."

9. Paragraph 1 of the Euclid Foods case reads in part: "Although the business of some of the secondary employers involved here, standing alone or in conjunction with the business of the primary employer, did not meet the minimum requirements, the Trial Examiner asserted jurisdiction here on the basis of the aggregate business of all the secondary employers found affected by the Respondents' unfair labor practices. We agree with the Trial Examiner's conclusion that jurisdiction should be asserted. However, in asserting jurisdiction with respect to all the unfair labor practices found, we rely only on the fact that all

the secondary employers were victims of a pattern of unfair labor practices and that the business of one or more of the secondary employers, each standing alone, meets the jurisdictional requirements."

10. See Exhibit P–2, in which respondent charges 20 domestic distributors with a violation of 29 U.S.C.A. § 158(d) by refusing to execute the printed 1957 contract and failure to comply with its terms.

11. Ferrolini Corp. v. General Anilene & Film Corp., D.C.N.D.Ill.1952, 107 F. Supp. 326; Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co., 6 Cir., 1937, 95 F.2d 978, certiorari denied 1938, 306 U.S. 665, 59 S.Ct. 459, 83 L.Ed. 1061.

12. Hartman v. Cohn, 1944, 350 Pa. 41, 38 A.2d 22.

spotless hands.[13] Under these principles, and the rule that it is not incumbent upon the plaintiff, as part of his case, to prove that he has not failed to do equity,[14] it is not clear that those members of Delaware Valley, who have no contract with respondent, would not be entitled to relief if they were the plaintiffs.

██ In any event, this case involves more than a request for an injunction under common law. It is brought under statutory law and the grant of the injunction depends upon the standards set forth in the statute.[15] The Court of Appeals of this Circuit has expressly disclosed that the clean hands doctrine is not applicable in a proceeding where a government agency is seeking to enforce its order in the public interest.[16] Since the fact finder in these cases is the Board, it is held that if the court finds reasonable cause to uphold the Board's charges, the injunction shall issue.[17] The fact that the Regional Director of the Board, and not Delaware Valley, is the party of record supports the application of the Eichleay doctrine. Also, it should be noted that some of the members of Delaware Valley signed neither the January agreement nor the final 1957 contract and, hence, the doctrine of unclean hands could in no event apply to them.[18] Under the facts of this record, it is "just and proper" to issue the injunction. The breadth of the words "induce and encourage," as used in Section 8(b) (4) (29 U.S.C.A. § 158(b) (4)), has been emphasized by the United States Supreme Court in International Brotherhood of Electrical Workers v. N. L. R. B., 1951, 341 U.S. 694, 702–703, 71 S.Ct. 954, 95 L.Ed. 1299.

### 3. *Hot Cargo Clause*

██ Some labor-management contracts contain "Hot Cargo" clauses, which are agreements in advance that secondary boycotts will be acceptable under certain circumstances. The legality of such clauses, in view of the terms of the Taft-Hartley Act, is in doubt. There are several cases now before the Supreme Court of the United States concerning the validity of such clauses.[19]

The Board's rule concerning such clauses is found in Local 1976, Brotherhood of Carpenters, and Sand Door & Plywood Co., 113 N.L.R.B. 1210 (1955). This rule has been approved by two Courts of Appeals and several District Courts. See N. L. R. B. v. Local 1976, etc., 9 Cir., 1957, 241 F.2d 147, 155; N. L. R. B. v. Local 11, Brotherhood of Car-

13. Hoehn v. Crews, 10 Cir., 1944, 144 F. 2d 665, 672.

14. First National Bank v. Pittsburgh, D.C.E.D.Pa.1939, 31 F.Supp. 381.

15. Douds v. Anheuser-Busch, Inc., D.C. N.Y.1951, 99 F.Supp. 474, 477. The National Labor Relations Act, as amended, declares that when dealing with this type of case, the courts are not bound by the restrictions of the Norris-La-Guardia Act, 29 U.S.C.A. § 101 et seq. See 29 U.S.C.A. § 160(b).

16. Eichleay Corp. v. N. L. R. B., 3 Cir., 1953, 206 F.2d 799, 806.

17. Shore v. Building & Construction Trades Council, 3 Cir., 1949, 173 F.2d 678. See, also, cases cited at end of first sentence under "B. Law" above.

18. These members of Delaware Valley are: Sinclair Washington, Robert J. Crooks, Jack Caruluzze, and Hugh F. Sweeney. It is noted that two of these members did not sign the power of attorney (Exhibit R–2A). Furthermore, several members of Delaware Valley (for example, Barrett, DiRosa, and Sizer, who was in effect the operator of Queen Bee and attended the December 12, 1957, domestic distributors' meeting on its behalf) are operators of the business or general managers, having no employees, and as such are not under any duty to bargain collectively. Cf. footnote 10 above. See Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906; 29 U.S.C.A. § 152 (2, 11).

19. The arguments made to the Supreme Court of the United States for and against the validity of the so-called "Hot Cargo" clauses are summarized at 26 Law Week 3261.

penters, 6 Cir., 1957, 242 F.2d 932, 936; Roumell v. United Association of Journeymen and Apprentices, etc., D.C.E.D. Mich.1957, 151 F.Supp. 706; Alpert v. Brotherhood of Carpenters, D.C.Mass. 1956, 143 F.Supp. 371.[20]

The fact that two appellate courts hold that a hot cargo clause is no defense to conduct prescribed by Section 8(b) (4) (A) constitutes adequate basis for injunctive relief in this matter, especially when the reasoning of these courts appears convincing on the facts of this case.

In addition, even assuming so-called "Hot Cargo" clauses valid, the clauses relied upon by the respondent are not applicable to the present situation. The union has cited Article IV of its agreement with the breweries, which applies to the latters' drivers, helpers and warehousemen,[21] and Article XIX of the contract between the union and the distributors.[22] Substantially, both contracts only provide that the refusal of an employee to load or unload a truck operated by one who is not a member in good standing of a union shall not be a violation of the contract or a cause for discharge. Since the uncontradicted record shows that all trucks owned by members of Delaware Valley were operated by persons who were members of Local 830, the clauses do not justify the respondent's appealing to persons employed by a secondary employer. In the case of the breweries, there is the added fact that persons not members of Local 830 were induced to boycott members of Delaware Valley.[23] The hot cargo clause does not confer upon respondent the right

20. The court has not overlooked the rejection of the rule by two Courts of Appeals in General Drivers, etc., v. N. L. R. B., 1957, 101 U.S.App.D.C. 80, 247 F.2d 71; Milk Drivers and Dairy Employees v. N. L. R. B., 2 Cir., 1957, 245 F.2d 817. It is noted that in reference to the latter case, the Court of Appeals for the Second Circuit, in Douds v. Milk Drivers & Dairy Employees Union, Local 584, 2 Cir., 1957, 248 F.2d 534, affirmed an injunction issued pursuant to Section 10(*l*) of the Act, notwithstanding the union's claim that the earlier decision of that court, reported at 245 F.2d 817, held similar conduct pursuant to a hot cargo clause to be lawful.

21. In Exhibit R-6, the applicable provision states:
"The refusal of any employe or employes to load or unload, or handle merchandise coming off or going on a beer distributor's truck driven by any one other than a member in good standing of, or a person holding a work permit from a labor union, shall not be a violation of this agreement or in itself be cause for discharge."

22. In Exhibit R-4, the applicable provision states.
"Section 2. The refusal of any employee or employees to load or unload or handle merchandise coming off or going on a beer distributor's truck driven by anyone other than an employee represented by a Local Union of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America shall not be a violation of this Agreement, or in itself be a cause for discharge. The Employer shall not request any employee or employees to load or unload or handle merchandise coming off or going on a beer distributor's truck driven by anyone other than an employee represented by a Local Union of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and, if the Employer so requires, then the Union shall have the right, if it so chooses, to terminate this Agreement."

23. The agreement (R-6) between Local 830 and the Philadelphia Lager Brewers Association specifically states in Article I, Section 2 thereof:
"The Employer recognizes the Union as the sole collective bargaining agent for its drivers, helpers and warehousemen in the Delivery Department at its plant or plants in Philadelphia and Norristown. This Agreement shall not be construed to extend to or affect in anyway any other phase of Employer's business, or any employees not employed in said plant or plants. The Term 'employee' or 'employees', as used in this Agreement, shall be construed to include only the classifications of employes specifically listed in this Section and employed in Employer's plant or plants aforesaid."

to appeal to employees not covered by the clause to refuse to perform services in violation of Section 8(b) (4) (A). Cf. General Drivers, etc. Local 886, v. N. L. R. B., 1957, 101 U.S.App.D.C. 80, 247 F.2d 71, 75.

### 4. *Picketing at Situs of Secondary Employer*

The respondent here contends that the actions of the union are not violative of the National Labor Relations Act, as amended, relying on the Moore Drydock case, 92 N.L.R.B. 547 (1950), as authority. In that case, the working conditions aboard a vessel were the source of the complaint and the owner of the vessel had no dock of its own in any part of the United States. Picketing was done while the ship was being readied for its voyage at a port belonging to another person. The Board stated that picketing of the secondary employer would be considered primary if the following conditions were met:

"(a) The picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs;* (c) the picketing is limited to places reasonably close

to the location of the *situs;* and (d) the picketing discloses clearly that the dispute is with the primary employer."

It is declared that the conditions were all met and that the picketing was permissible.[24] The criteria set forth in this case have been accepted by various Circuit Courts (and followed by later Board decisions).

In the Washington Coca Cola case, 107 N.L.R.B. 299 (1953),[25] the Board stated at page 302:

"After six years of Board and Court construction of Section 8(b) (4) (a) of the Act, the fundamental principle has been established that this section proscribes picketing at the separate premises of employers who are not a party to the picketing union's primary labor dispute."

The case stated that the Moore Drydock principles did not have to be rejected or affirmed, since the case involved a primary employer who had a plant where the drivers entered and left at least four times a day and which had been picketed by the union from the beginning of the strike.

Since the Washington Coca Cola decision, the Board has followed that rule and, in all instances except one,[26] the

---

Therefore, the agreement only applied to those employees specifically covered by the agreement.

The respondent has admitted that some of the brewery employees who load and unload the domestic distributors' trucks are not members of Local 830. The so-called "Hot Cargo" clause in the union-brewers contract is not applicable to such employees.

24. It is to be noted that the holding is a narrow one, as is seen by the following language found at page 551 of the decision:

"We are not holding, as the dissenters seem to think, that a union which has a dispute with a shipowner over working conditions of seamen aboard a ship may lawfully picket the premises of an independent shipyard to which the shipowner has delivered his vessel for over-

haul and repair. We are only holding that, if a shipyard permits the owner of a vessel to use its dock for the purpose of readying the ship for its regular voyage by hiring and training a crew and putting stores aboard ship, a union representing seamen may then, within the careful limitations laid down in this decision, lawfully picket in front of the shipyard premises to advertise its dispute with the shipowner."

25. Enforced, Brewery & Beverage Drivers and Workers Local No. 67 v. N. L. R. B., 1955, 95 U.S.App.D.C. 117, 220 F.2d 380.

26. In Sales Drivers v. N. L. R. B., 1956, 97 U.S.App.D.C. 173, 229 F.2d 514, the court merely said that the Board could not hold picketing unlawful *per se* because of the availability of another place to picket. It also said that if the

courts before which the question has arisen have enforced orders of the Board based on that rule. Diaz Drayage Co., 117 N.L.R.B. 885, enf'd. General Truck Drivers, etc. v. N. L. R. B., D.C.Cir.1958, 252 F.2d 619; Caradine Co., 116 N.L.R.B. 1559, enf'd. N. L. R. B. v. General Drivers, etc., 6 Cir., 1958, 251 F.2d 494; Barry Controls, Inc., 116 N.L.R.B. 1470, enf'd. N. L. R. B. v. United Steelworkers, 1 Cir., 1957, 250 F.2d 184; National Trucking Co., 111 N.L.R.B. 483, enf'd. N. L. R. B. v. Truck Drivers & Helpers, etc., 5 Cir., 1956, 228 F.2d 791; Gotham Broadcasting Corp., 110 N.L.R.B. 2166, enf'd. N. L. R. B. v. Associated Musicians, 2 Cir., 1955, 226 F.2d 900, certiorari denied 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483; Cache Valley Dairy Association, 116 N.L.R.B. 220, injunction granted, Douds v. Teamster Local 976, D.C.S.D.N.Y.1956, 139 F.Supp. 702. See, also, Retail Fruit & Veg. Clerks Union v. N. L. R. B., 9 Cir., 1957, 249 F.2d 591; Piezonki v. N. L. R. B., 4 Cir., 1955, 219 F.2d 879; N. L. R. B. v. Denver Bldg. & Const. T. Coun., 10 Cir., 1955, 219 F.2d 870; N. L. R. B. v. Chauffeurs, Teamsters, etc., 7 Cir., 1954, 212 F.2d 216, 219.[27]

Although there is doubt as to whether or not the above-quoted Moore Drydock language is still the rule of the N.L.R.B. in view of the later decision in the Washington Coca Cola case, supra, even if the Moore Drydock decision is still operative, the facts in this case do not bring the union's activities within its holding.

In N. L. R. B. v. United Steelworkers, 1 Cir., 1958, 250 F.2d 184, at page 187, the court stated:

"We may concede that the Moore Drydock doctrine would have application when the primary employer has a fixed and permanent place of business, but picketing his premises by striking employees would not in any real sense adequately publicize the labor dispute."

In this case, as in N. L. R. B. v. United Steelworkers, supra, the record discloses adequate opportunity to reach the members of the association and their employees elsewhere than at the places picketed.

All of the domestic beer distributors involved in this action had a place of business in Philadelphia. The court has reasonable cause to believe that the employees of the domestic distributors spent more time at their employer's situs than they did at any of the breweries or importing distributors. Therefore, there *was* a situs at the employers' places of business where the picketing could have taken place, and this was the most feasible place to reach the employees by picketing. The fact that there was such a situs takes the case out of the Moore Drydock case, supra, where the issue was stated at page 549:

"Does the right to picket follow the *situs* while it is stationed at the premises of a secondary employer when the only way to picket the

---

purpose of said picketing was to appeal to the employees of the secondary employer, it was unlawful in spite of apparent compliance with the Moore Drydock case. The Board, on remand, held that the purpose of the picketing was to reach secondary employers and entered a cease and desist order, which was enforced at Truck Drivers and Helpers Local, etc. v. N. L. R. B., 1957, 101 U.S. App.D.C. 420, 249 F.2d 512, certiorari denied 1957, 355 U.S. 958.

**27.** In N. L. R. B. v. General Drivers, 5 Cir., 1955, 225 F.2d 205, relied on by respondents, the court emphasized

that picketing was justified at the place of business of secondary employer because the employees almost never came to the place of business (warehouse) of the primary employer, using this language at page 210:

" * * * for picketing only at the warehouse 'situs' *where such other employees almost never came* was but a useless and futile gesture." (Emphasis supplied.)

In this case, the employees of the primary employer spent far more time at the primary employer's place of business than they did at the secondary employer's place of business.

*situs* is in front of the secondary employer's premises?"

The fact that each of the primary employers had a local place of business which was not picketed by the respondent is noted and shows that the purpose of the picketing was to reach secondary employers. In Sales Drivers, etc. v. N. L. R. B., 1956, 97 U.S.App.D.C. 173, 229 F.2d 514 and N.L.R.B. v. General Drivers, etc., 5 Cir., 1955, 225 F.2d 205, both of which are relied upon by the respondent, the business establishment of the primary employer was picketed at the same time that picketing was done elsewhere. This record indicates that the primary purpose of the picketing, which was only done at the secondary employers' places of business, was to affect the secondary employers' business.

Rulings on Evidence.

| | |
|---|---|
| N. T. 57 | Motion Denied. |
| N. T. 79 | Motion Denied. |
| N. T. 87 | Motion Denied. |
| N. T. 224 | Motion Denied. |
| N. T. 322 | Objection Overruled. |