NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DENVER BUILDING AND CONSTRUC-
TION TRADES COUNCIL et al.,
Respondents.

No. 4939.

United States Court of Appeals,
Tenth Circuit.

Feb. 14, 1955.

Ruth V. Reel, Washington, D. C. (George J. Bott, David P. Findling and Elizabeth Weston, Washington, D. C., appeared with her on brief), for petitioner.

Phillip Hornbein, Jr., Denver, Colo. (Phillip Hornbein and Roy O. Goldin, Denver, Colo., appeared with him on brief), for respondents.

Before BRATTON and MURRAH, Circuit Judges, and VAUGHT, District Judge.

VAUGHT, District Judge.

This case is before this court upon the petition of the National Labor Relations Board (herein called Board) pursuant to Section 10(e) of the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., for enforcement of its order issued against respondents on April 21, 1954. Respondents are Denver Building and Construction Trades Council (herein called Council) and six constituent unions: International Association of Bridge, Structural and Ornamental Iron Workers, Local Union No. 24, AFL (herein called Iron-workers); International Hod Carriers, Building and Common Laborers' Union of America, Local Union No. 720, AFL (herein called Hod Carriers); Brotherhood of Painters, Decorators and Paperhangers of America, Local Union No. 79, AFL; International Union of Operating Engineers, Local Union No. 9, AFL; and United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local Unions No. 208 and No. 3, AFL. This court has jurisdiction of the proceeding

under Section 10(e) of the Act, the alleged unfair labor practices having occurred near Leadville, Colorado, within this judicial circuit.

The statement of facts, as presented in the brief of the petitioner and fully supported by the record, is as follows:

The Board found that respondents violated Section 8(b) (4) (A) of the Act by picketing and related activities at the premises of Climax Molybdenum Company (herein called Climax) to induce or encourage employees of Climax and of various neutral contractors on the Climax premises to engage in a concerted refusal to work, with the object of: (1) forcing Climax to cease doing business with C. Ryan and Sons (herein called Ryan), a contractor on the Climax premises with which respondents had a labor dispute, and (2) forcing the other contractors (herein referred to collectively as Contractors other than Ryan), to cease doing business with Climax in order to force Climax to cease doing business with Ryan.

Climax mines and mills molybdenum ore and also maintains a self-sufficient community for its employees within a fenced area of two or three square miles in the mountains near Leadville, Colorado. During the summer of 1953, Climax was engaged in a substantial expansion program. Numerous contracts with four or five prime contractors were under way and, as is customary in the construction industry, several subcontractors were working on the projects. Included among the prime contractors was Ryan, which had nine written contracts for grading and excavating building sites, grading roads, enlarging storage and parking areas, installing sewer and water systems, and transporting slag ballast. In addition to these construction contracts and one for open pit mining, which were on a cost-plus-fixed-percentage basis, Ryan had a firm bid contract for furnishing sand and gravel.

Although not the only earthmoving contractor to which Climax let contracts, Ryan had done business with Climax for 14 or 15 years. Its main office was in Lakewood, a suburb of Denver, some 60 miles from the Climax premises. It employed a work force of 50 or so men, substantially all of whom were currently engaged on its Climax contracts. The extensive equipment required for its operations was owned by Ryan or leased by it from persons other than Climax. Climax had no financial or business interest in Ryan, and no power to hire, discharge, or direct Ryan's employees.

Because of their long association and the nature of earthmoving work, Ryan's 1953 contracts with Climax contained no detailed specifications. Some of them provided that Ryan would excavate and grade "as directed" by Climax engineers or "in accordance with the cut and grades set by" Climax engineers. The parties had an implied understanding that the Climax engineering staff would work ahead of Ryan, placing survey stakes or bench marks to designate grades and baselines, and check frequently to see that the results were satisfactory. According to Climax, its engineers designate "not how the contractor does his work but how the work must be completed," and supervise other contractors on the Climax projects in the same manner. Ryan's construction contracts specified commencement and completion dates, but were terminable without notice by Climax.

Under their typical contracts, Climax compensated Ryan on a "cost-plus" basis, and any increases or decreases in the wages paid by Ryan to laborers were passed along to Climax except where, as in the case of one elaborate contract performed in 1951, the parties had agreed in advance to a ceiling on such wages. This reimbursable labor item, however, accounted for only a small percentage of the total amounts paid out by Climax on Ryan contracts. The major cost item was rental for Ryan's heavy equipment which was furnished with operators, and Lee Ryan testified that in cases where the operators' wage rates were increased his firm absorbed the difference. Ryan, like many of the other contractors having cost-plus arrangements with Climax,

often advised Climax in advance when it contemplated an upward revision of wages and received assurance that Climax would not object to the resultant increase in reimbursable costs. Under the usual contract, however, Ryan was not required to give Climax notice or obtain its consent to prospective wage changes, and increases even in reimbursable items were not infrequently effected before Climax was notified.

Upon the foregoing facts, the Board found that the relationship between Ryan and Climax was that of independent contractor and that Climax had only negative control over Ryan's wage rates.

Climax enjoyed harmonious relations with respondents and with the union representing its own employees at all material times herein. A long-standing dispute between respondents and Ryan came to a head in July, 1953. Ryan was the only nonunion contractor on the Climax project. In August, 1952, Climax had met with representatives of respondents to investigate reported threats that a picket line would be placed on construction work at Climax if Contractors did not put pressure on Climax to force Ryan to become unionized. When asked if this was true, Council Secretary Clifford Goold replied that "anything necessary would be done" to bring about a solution of the Ryan problem. Goold admitted at the hearing that respondents might also have asked Climax to get rid of Ryan, adding: "I don't recall that we were harsh about it. We were more interested in organizing Ryan's men than we were in hurting his business." In response to respondents' request for more leeway to solicit Ryan's employees on the Climax premises, Climax agreed to furnish its recreation hall for an organizational meeting. The meeting was held in August, 1952, but the Ryan employees proved completely unreceptive to union organization.

Ryan's use of nonunion labor and its allegedly substandard wages became a matter of such concern to respondents in the 1953 construction season that their respective business agents, in a

July 29 meeting presided over by Goold, voted to picket "the project" on July 31. That same night, Goold and Ironworkers' Agent Fitzwater met with representatives of Climax and Contractors to discuss an Ironworkers walkout which was unrelated to the issue here. After an amicable agreement had been reached as to the Ironworkers' dispute, Goold remarked that certain contractors at Climax had "substandard" wages and working conditions. Goold, who at that time was unfamiliar with Ryan's wage rates, equated "substandard" with "nonunion." When a Climax official asked if he meant any of those present, Goold replied that he did not, but that they might all be affected in the future unless the situation was changed. In a subsequent conference with Climax alone, Goold admitted that he had been referring to Ryan, stating further that it would be desirable if steps were taken to unionize Ryan's employees. Upon Climax's refusal to interfere with Ryan's labor relations, Goold asked if Climax could obtain a union contractor to replace Ryan. Despite Climax's reply that Hesser, a union contractor who had done similar work for Climax, was engaged in construction elsewhere at the time, Goold persisted in his proposal that Ryan be replaced with a union contractor and added that it would be "advisable" for Climax to cease doing business with Ryan "for a while."

The fence around most of the Climax property had but one main gate in the vicinity of the state highway. Employees not accommodated on the premises, i. e., many of Contractors' and about 10 percent of Climax's, were required to pass through this gate to work. The gate was manned by Climax guards who required either a badge or special permission for entrance.

Pursuant to the vote at respondents' July 29 meeting, pickets appeared at the Climax gate at 6:00 A. M. on Friday, July 31, and picketed there throughout the day. Included among them were four employees of Intermountain Builders, who had been requested by Hod

Carriers Agent Buscietta to leave their work and to act as pickets. Although the pickets carried signs with the legend, composed by Goold, that "C. Ryan and Son and Eagle Lake Gas Company were unfair to the Building Trades Council because they were paying substandard wages," they did not seek permission to picket at Ryan's job sites inside the gate, nor did they picket two Ryan jobs on Climax property outside the fence where no employees, other than Ryan's, would be affected. Construction on the Climax projects was almost at a standstill that day because a sizeable number of Contractors' employees, who were members of respondent unions, refrained from working.

The petitioner relies upon the following points:

I. The Board properly held that respondents' picketing at the Climax gate was "secondary" activity within the proscription of Section 8(b) (4) (A) of the Act. A. Climax was neither the employer of Ryan's employees nor an "ally" of Ryan, but was a neutral employer entitled to the protection of Section 8(b) (4) (A). B. Although respondents' dispute was with Ryan alone, and Climax and Contractors were neutral employers unconcerned in the dispute, the picketing was directed against Climax and Contractors, and it was designed to force Climax to cease doing business with Ryan.

II. The Board also properly found that respondents Hod Carriers and Ironworkers independently violated Section 8(b) (4) (A) by directly inducing their members in the employ of certain Contractors to go on strike for the same illegal object.

Section 8(b) (4) (A) provides that it is an unfair labor practice for a union "to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * perform any services, where an object thereof is forcing or requiring * * * any employer or other person * * * to cease doing business with any other person."

Under this provision it is unlawful for a union to establish a secondary boycott by directing economic pressure such as picketing against a neutral employer, that is, one who is not a party to the underlying labor dispute and not able to promote the union's objectives in that dispute except by the indirect means of ceasing to do business with the primary employer.

In National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284, the Supreme Court sustained the Board's finding that, by engaging in a strike an object of which was to force the general contractor on a construction project to terminate its contract with a subcontractor employing nonunion labor on the project respondent labor organization committed an unfair labor practice within the meaning of Section 8(b) (4) (A), supra.

The issue in this case is whether or not Ryan was an independent contractor.

Without attempting to review or analyze here the numerous authorities cited in the briefs for petitioner and respondents, it is apparent to this court that the relationship between Climax and Ryan was that of independent contractor; that there was no controversy between respondents and Climax or the Contractors other than Ryan; that the Board's finding that respondents' picketing was directed against Climax and the Contractors other than Ryan is fully supported by the record; and that the action of the respondents in attempting to force Climax to discontinue its contracts with Ryan, by picketing Climax and its Contractors other than Ryan and thus force the unionization of Ryan's employees, was in violation of Section 8(b) (4) (A) of the Act.

The order of the Board accordingly will be enforced.