Emmett BLAIR and Jack W. Blair t/a Blair-Elkhorn Mining Company, Plaintiffs,

v.

UNITED MINE WORKERS OF AMERICA and United Mine Workers of America, District 30, Defendants.

No. 572.

United States District Court
E. D. Kentucky,
Pikeville Division.

Nov. 2, 1962.

Stephen Combs, Jr., Whitesburg, Ky., Greear, Bowen, Mullins & Winston, by Fred B. Greear, Robert T. Winston, Jr., Norton, Va., for plaintiffs.

Harrison Combs, Washington, D. C., H. B. Noble, Hazard, Ky., John Y. Brown, Lexington, Ky., Thurman Hibbitts, J. Ervin Sanders, Pikeville, Ky., Grant F. Knuckles, Pineville, Ky., for defendants.

SWINFORD, District Judge.

The plaintiffs are coal operators in eastern Kentucky. They were the owners of a coal lease near Mayking in Letcher County. In 1958 they began the development of this particular coal lease by strip mining methods and were selling the coal produced to The Spreader Fuel Company, The Little Shepherd Coal Company, and to Roland Price at his Mayking ramp. The larger portion of the coal produced was sold to Roland Price.

At the beginning the plaintiffs operated on a close margin and probably lost money but by December 1958 the business reached the point where it was making money and was otherwise successful at the time of the instances complained of. There was adequate machinery and equipment on hand at the site to perform the strip mining.

In April, 1959 the plaintiffs were compelled to cease operation and to move their equipment from the site near Mayking into Virginia and to abandon the mining of coal in Kentucky because of the violation of law on the part of the defendants. The employees of the plaintiffs were dealing with their employer independently and were not represented by the defendants as their bargaining agent. The plaintiffs had no contract with the defendants as authorized by the Labor Management Relations Act of 1947 (29 U.S.C.A. § 187 et seq.). Section 8(b) (4) (A) of the Act is designed to protect innocent third persons from economic loss as a result of a labor dispute in which they have no concern. The plaintiffs contend that they are the victims of a secondary boycott and that they have an action for damages, of which this court has jurisdiction, against the defendants for unlawful acts committed against them. 29 U.S.C.A. § 187 (b).

This case is one of a series of cases which have been brought in this district against the defendants, growing out of the action of their agents and employees in conducting a strike which commenced on or about March 15–17, 1959. It would add nothing to this opinion or to the enlightenment of the litigants for the the court to review the instances of misconduct attributed to the defendants, their agents and employees, which led to this and similar claims for damages by coal operators and those connected with them. The court feels that this case is covered completely, both as to law and fact (insofar as the general strike situation is concerned), in the case of Flame Coal Company v. United Mine Workers of America, 6 Cir., 303 F.2d 39 (1962). To again recite, in more or less detail, the chronology of events which took place over a period of several weeks and months in the spring and summer of 1959 would be but to be-

labor a point that is well known to all persons connected with this case. The following is a quotation from the Flame Coal Company case and is a sufficient recitation of the general background which led to the actions on the part of the defendants, their agents and employees in the instant case and of which the plaintiffs here complain:

"Plaintiffs were among one hundred and seventy-six (176) coal companies in the southeastern Kentucky-northeastern Tennessee region which had not signed the National Bituminous Coal Wage Agreement of 1950, as amended in 1958. In the spring of 1959, starting about March 17, the defendant, United Mine Workers of America, carried on a campaign to obtain agreements with unsigned companies, including plaintiff Flame. The campaign was conceived and prosecuted on a grand scale. Spectacular and varied methods were employed. Mass picketing at the tipple sites, on the highways, on railroad sidings, and at the mines was carried on. Pickets, sometimes numbering in excess of a thousand men, roamed throughout the area in motor convoys. The persuasion of sheer numbers was supplemented by more violent and forceful methods. Trucks were stopped at tipples, and on the way to and from them; their loads were dumped on, and off of, the highway. Mine and tipple workers were beaten. Strong threats of violence were made to the independent truck drivers to persuade them to discontinue transporting coal from the mines to the tipples. After April 30, 1959, when mass picketing was substantially discontinued because of a federal court injunction (there was evidence by defendant that the picketing convoys were stopped because troublesome strangers were joining them) the pattern of coercion took a different and still more violent turn. Railroad tracks and bridges were dynamited, as were tipples, trucks and other equipment. In fulfillment of a prophetic warning to truckers and others that 'when the leaves come out on the trees' more convincing methods would be employed, the Flame tipple was put under gunfire from the nearby hills almost daily. There was evidence that guards at the tipple, on some occasions, returned the fire.

*     *     *     *     *     *

"Field representatives of defendant United Mine Workers directed and led the convoys of pickets and were present at or near the scene of much of the described violence. These field men were selected and appointed by the President of District 30 of the defendant United Mine Workers. The events here involved occurred within District 30. Specific identification of the riflemen in the hills, the dynamiters, and other individuals, perpetrators of violence and threats, was not made. Defendant's witnesses testified of instructions given to the members of the convoys to behave themselves and not violate the law. Our review of the record, however, satisfies us that there was admissible and competent evidence from which the jury could infer and find that defendant union was the author of, and responsible for, the violence and illegal conduct which effectively interrupted and interfered with the business of plaintiffs. The evidence was sufficient to support a verdict and judgment requiring defendant union to respond in damages for the acts of its members, agents and representatives. United Mine Workers of America v. Patton, 211 F.2d 742, 47 A.L.R.2d 850 (C.A. 4, 1954); United Mine Workers of America v. Meadow Creek Coal Co., 263 F.2d 52, 61 (C.A. 6, 1959) cert. denied 359 U.S. 1013, 79 S.Ct. 1149, 3 L. Ed.2d 1038."

Since the appellate court has found these facts as covering the general area

there, it must be accepted as a finding of fact pertinent to the case at bar.

The Flame Coal Company case was tried by jury and under instructions the jury found the facts set out in the opinion above quoted and which the court therein held to be a justified finding. This court as the trier of law and facts is bound by that decision and therefore finds that the unlawful acts recited in the evidence in this case were of such a nature and under such circumstances that the defendants are bound to be held responsible and accountable in damages. The evidence discloses and the court finds that the agents and employees of the defendants committed an unjustified and unprovoked assault upon the plaintiffs in their operation on the mountain near the Mayking tipple on April 6, 1959. Bands of forty to fifty men, over a period of several hours on that date and on subsequent dates, conducted themselves in such a way that the employees of the plaintiffs refused to work and the plaintiffs were thereby unable to carry on their enterprise and were compelled to cease the operation and to abandon the project. The conduct of the defendants was not for the purpose of lawfully picketing the mining operation of the plaintiffs with a view to having them sign a contract or to solicit the membership of the plaintiffs' employees in the defendant union. No effort was made to secure a contract by request or conference. The sole purpose of the conduct of the defendants in going upon the plaintiffs' operation with bullwhips and a weapon, coupled with abusive language and threats, was to prevent the production of coal for delivery to the Roland Price Mayking ramp. This constituted a secondary boycott for which the plaintiffs may recover in damages. The defendants were endeavoring to induce, persuade or force Roland Price to sign an employment contract. To do this they resorted to violent means and placed Roland Price and his employees in fear of injury. Price also feared damage to or destruction of his property. National Labor Rel. Bd. v. Denver Bldg. & Const. Trades Council, 10 Cir., 219 F.2d 870; National Labor Relations Board v. Local Union No. 55, 10 Cir., 218 F.2d 226.

On March 16 Joe Davis, a District 30 field representative, went to the tipple and demanded that it be shut down and that Price sign a contract. Price refused and some forty or fifty pickets were stationed at this site to remain generally for the next six weeks. During this time Joe Davis was in attendance at the picket line on several occasions conversing with the leaders. Men would drive along the road and empty their revolvers into the tipple. Trucks that were attempting to unload at the tipple would be subjected to rifle fire. Price received numerous threats from pickets during these times. On one occasion he was beset by a group of knife-wielding strikers and forced to take a place in the picket line. He was promised a drenching in the river one time and on many occasions was derided with insulting epithets.

Plaintiffs' theory of liability is that the situation described here is both a secondary boycott made unlawful by Section 303 of the Taft-Hartley Act (29 U.S.C.A. § 187(a)) and an interference with contractual rights under the common law of the state.

Though there is no condemnation of a secondary boycott as such in the National Labor Relations Act, the following conduct is proscribed by section 303:

"(a) * * * for any labor organization to engage in, * * * a strike * * *, where an object thereof is—

"(1) forcing or requiring * * * any employer or other person * * * to cease doing business with any other person;"

By subsection (b) of this section a party injured by a violation of the above-quoted provision is accorded a recovery in damages.

Certainly every strike is aimed at forcing the employer to cease doing business with other persons, preferably

with all other persons. Consequently there has been a need to adopt refinements from the quoted section with reference to the objective that Congress had in its enactment. The provision represents an accommodation of the policy of permitting organized labor to bring full pressure to bear against an employer playing a primary role in a dispute and the policy of insulating those employers whose connection with the controversy is only remote or subsidiary. Retail Fruit and Vegetable Clerks' Union v. N. L. R. B., 9 Cir., 249 F.2d 591. The courts have thus had to isolate and identify in each case activity which is permissibly primary or proscribed secondary in its effect. N. L. R. B. v. Local Union No. 55, 10 Cir., 218 F.2d 226 (1954). To so classify the conduct involves a determination of whether the pressure is directed at an employer who is able to promote the union's objective by means other than by ceasing to do business with some particular person. N. L. R. B. v. Denver Building and Construction Trades Council, 10 Cir., 219 F. 2d 870 (1955).

■ The court finds that the activity here directed at the Blairs was secondary. All the evidence is in favor of the conclusion that defendant unions had no special interest in the affairs of the Blair mines until they began to do business with Roland Price. While there was routinely a group of from forty to fifty pickets at the Price tipple, during the first few weeks of the strike the Blair mines were unmolested. The court cannot assume unrelated coincidence between the first attempt after the strike was called to haul coal to the Price tipple and the first incident of violence at the Blair operation. The day after the strike was called, Price was asked to sign a contract. The Blairs, on the other hand, were never even contacted with respect to signing a contract in connection with the pressure placed upon them by these events. The court attaches full credibility to the testimony that letters were sent to all of the operators in the area informing them of the contract termination but the special effort directed at the Price tipple contrasted with the relatively casual solicitation of the Blairs can lead to no other conclusion than that Price was the prime target of the union efforts in the Mayking area.

■ Counsel for the defendant unions throughout the trial and in their brief have had as their thesis that the unions had a legitimate reason to pressure the Blairs apart from any secondary consequences that might thereby be inflicted on Roland Price, that the Blairs had not signed a contract and that it had been historic policy of the union to discourage work without a contract. This is very acceptable reasoning but the Act requires that the court look for the principle motive where a boycott is in issue. The fact that there is *a* reason for direct pressure on an employer does not suffice to avoid the condemnation of the law unless it is the overriding motive. Local 74, United Brotherhood of Carpenters etc., Union v. N. L. R. B., 341 U.S. 707, 713, 71 S.Ct. 966, 95 L.Ed. 1309 (1951). As long as *an* object of the union activity is to force an employer to cease doing business with the employer who represents their main objective, the sanction of the Act applies. National Labor Relations Board v. Denver Building Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Compare opinion of the lower court, 10 Cir., 186 F.2d 326, 335.

The presence of Joe Davis at the picket line near the Price tipple and the assumption of the union agent at Frankfort of the ability to control the general pattern of violence as it suited the union aims is adequate proof of union responsibility for the activities at the Blair mine.

■ It could hardly be argued that the events of April 1959 did not cause somewhat of a turn in the Blair business. It has been seen that they were forced to leave the Mayking mine and move all of their equipment to Virginia. The cost of hiring guards, the expense of moving to Virginia, the expected profit on every ton of coal remaining in the

Mayking mine and improvements to the real estate are all sought to be charged to the defendants. Plaintiffs further demand punitive damages.

The evidence fairly proves that the fear of violence justified plaintiffs in idling their mine and posting guards for the protection of their equipment. Accordingly, they are entitled to the profits lost because of the events in issue here. The best evidence is that plaintiffs mined about 5000 tons of coal each month and that their profit per ton was 64.9¢. At this rate their profit per month would be $3245.00. There is also evidence that ordinarily production would rise appreciably during the summer months. The number of months to consider in computing the total loss of profits is a problem that cannot be answered with logical precision but the consequences of the uncertainty involved in this determination cannot be charged entirely to the plaintiffs. Flame Coal Company v. United Mine Workers of America, 6 Cir., 303 F.2d 39 (1962). The record does not indicate positively when the force and violence ended. Moreover, the end of hostilities viewed retroactively does not necessarily coincide with the termination of restraints on plaintiffs' ability to resume their normal operations. The rampant demonstrations of the defendants' agents were obviously intended to discourage normal activity by plaintiffs for some substantial length of time. Plaintiffs could be reasonably expected to have extended their retreat to the point where the time elapsed gave extravagant assurance that there would be no recurrences of the violent activity. Giving due regard for these considerations, it is the opinion of the court that the plaintiffs are entitled to recover $10,000 to compensate for lost profits.

It is not clear on what theory the plaintiffs seek to recover the expense of moving their equipment to Virginia but on the theory that this was necessary as a protective measure, this is an allowable item of recovery. Flame Coal Company v. United Mine Workers of America, supra. There is testimony that during the period of time involved here the plaintiffs had their deep mining equipment at a nearby location destroyed by the action of strikers. The value of the equipment at the Mayking mine was in the neighborhood of $160,000 when new and the expense of moving it was $4373, not at all disproportionate to the value. On the same premise the expense of hiring guards is chargeable to defendants and has been proved to the satisfaction of the court in the amount of $1317.25. The expense of maintaining the guards at the Blair mines may be figured by deducting from $1702.75, the amount found in plaintiffs' Exhibit 7, all charges incurred after May 21, 1959 and all charges incurred before April 16, 1959. This amounts to $1317.25 which the plaintiffs are entitled to recover.

The demand for the costs of improving the real estate at the mine site by way of rights of way and roads built on them is not allowable. The roadways are permanently fixed to the land and cannot have suffered at the hands of the defendants. Lewis v. Benedict Coal Corporation, 6 Cir., 259 F.2d 346 (1958). Damages sought to be attributed to the loss of use of the equipment is covered by the award for lost profits.

■ The claim for punitive damages is resisted on the ground that the complaint does not pray for them as such. But the complaint does allege a purposeful invasion of plaintiffs' rights under the National Labor Relations Act and under the laws of Kentucky. United Mine Workers of America v. Meadow Creek Coal Company, 6 Cir., 263 F.2d 52 (1959). Opinions in similar cases have held punitive damages to be fitting retribution for conduct of the character proved here. Flame Coal Company v. United Mine Workers of America, supra; Gilchrist v. United Mine Workers of America, 6 Cir., 290 F.2d 36 (1961); United Mine Workers of America v. Osborne, 6 Cir., 279 F.2d 716 (1960). This case would therefore seem to fall within the rule that punitive damages may be awarded though not specifically demanded in the complaint where the facts

pleaded and proved form adequate grounds for such an award. 15 Am. Jur., Damages, Sec. 326. Punitive damages in the amount of $10,000 will be assessed against the defendants.

It is the conclusion of the court that the evidence supports an award to plaintiffs of compensatory and punitive damages in the amount of $25,690.25, along with allowable court costs. A judgment in conformity with this opinion will be entered this day.

The opinion sets forth findings of fact and conclusions of law which the court feels sufficiently comply with Rule 52(a), Rules of Civil Procedure. No formal findings of fact and conclusions of law will be filed.