**SHEET METAL WORKERS INTERNA-
TIONAL ASSOCIATION, LOCAL UN-
ION NO. 223, AFL–CIO, Appellant,**

v.

**ATLAS SHEET METAL COMPANY OF
JACKSONVILLE, Appellee.**

No. 22626.

United States Court of Appeals
Fifth Circuit.
Aug. 10, 1967.

Harry J. Kreamer, San Francisco, Cal., for appellant.

Edwin L. Miller, U. S. Atty., Shelby Gott, Asst. U. S. Atty., San Diego, Cal., for appellee.

Before MERRILL and ELY, Circuit Judges, and BYRNE, District Judge.

Seymour A. Gopman, Miami Beach, Fla., for appellant.

Albert S. C. Millar, Jr., Jacksonville, Fla., for appellee.

Before GEWIN and GOLDBERG, Circuit Judges, and SPEARS, District Judge.

GEWIN, Circuit Judge:

Atlas Sheet Metal Company of Jacksonville brought suit against the Sheet Metal Workers International Association, Local Union No. 223, AFL–CIO pursuant to Section 303 of the National Labor Relations Act, 29 U.S.C. § 187,[1] in the United States District Court for the Middle District of Florida alleging that the union had violated Section 8 (b) (4) (i) and (ii) (B) of the Act and that such violation had caused plaintiff damages. The jury returned a verdict for the plaintiff and final judgment was entered by the district court in favor of the plaintiff in the amount of $3,501.56. From this judgment the Sheet Metal Workers Union, Local 223 appeals. We affirm the judgment of the district court as to liability but reverse and remand for a determination as to the proper amount of damages.

Atlas Sheet Metal Company of Jacksonville (Atlas of Jacksonville) is a sheet metal fabricating contractor with its principal place of business in Jacksonville, Florida. In September 1963 Atlas of Jacksonville had a collective bargaining agreement with Sheet Metal Workers International, Local Union No. 435. A

---

1. "§ 187 Unlawful activities or conduct; right to sue; jurisdiction; limitations; damages

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b) (4) of this title.

(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

sister union, Sheet Metal Workers International Association, Local Union No. 223, has its principal office and place of business in Miami, Florida. Local 223, had since July 1963, picketed Atlas Sheet Metal Works of Miami (Atlas of Miami),[2] a metal fabrication corporation, in furtherance of their labor dispute with that company. In September, 1963, Local 223 began picketing Atlas of Jacksonville's place of business. The pickets carried signs which read: "Sheet Metal Workers L.U. 223 AFL–CIO on strike against Atlas Industries, Inc., Atlas Sheet Metal Company is affiliated and allied with Atlas Metal Industries, Inc." Due to the picket line, none of Atlas of Jacksonville's sheet metal employees reported to work. Atlas of Jacksonville attempted to compel its employees to return to work by seeking an injunction in the state court against Local 435, but the attempt proved to be unsuccessful. Atlas of Jacksonville then filed with the National Labor Relations Board an unfair labor practice charge against Local 223 alleging violations of section 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (4) (i) and (ii) (B). The picketing ceased on September 16, 1963.

Atlas of Jacksonville then brought this suit against Local 223 for damages resulting from the Union's alleged violation of section 8(b) (4) (i) and (ii) (B). At the close of Atlas of Jacksonville's case, Local 223 made a motion for a directed verdict which was denied by the court. Local 223 then elected not to produce any testimony or present any witnesses on the basis that Atlas of Jacksonville had not proved a violation of the Act. The court instructed the jury and both parties filed objections to such instructions. The jury returned its verdict for Atlas of Jacksonville in the amount

of $2,634.37. Local 223 filed a motion for a new trial and a motion for a directed verdict and/or judgment notwithstanding the verdict and a motion to alter or amend judgment. All motions were denied and the court, in accordance with the jury verdict and with the stipulation of counsel as to costs and attorney's fees, entered final judgment for Atlas of Jacksonville in the amount of $3,501.56.

The jury found that Local 223 violated Section 8(b) (4) (i) and (ii) (B) of the NLRA which prohibits a union from engaging in activity known as a secondary boycott, although that term is not expressly used in the statute. This section reads:

"8(b) It shall be an unfair labor practice for a labor organization or its agents—

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in any industry affecting commerce, where in either case an object thereof is—

\* \* \* \* \* \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such la-

2. The record refers to this corporation by several different titles: Atlas Sheet Metal Works in Miami, Atlas Industries, Inc., Atlas Metal Industries, Inc., Atlas Metal Industries, Hialeah. We shall refer to it as Atlas of Miami.

The presentation of this case in this Court on appeal is not a model of clarity. The record of the proceedings is presented in three segments designated as *Supplemental Record, Duplicated Record* and *Second Supplemental Duplicated Record.* The briefs are vague. The trial was not a lengthy one, but the parties have totally failed to present the case to this Court in an orderly, clear and concise manner.

bor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;."

Essentially this statute means that it is unlawful for a labor organization to induce employees of a neutral employer to strike or for a labor organization to pressure a neutral employer where the object of the union is to force such employer to cease doing business with another employer or to force any other employer to recognize or bargain with an uncertified labor union. Therefore in order for a labor organization to violate this statute, it must engage in *unlawful activity* against a *neutral* employer for an *unlawful objective.*

It is contended by Local 223 that the evidence presented to the jury clearly showed that Atlas of Jacksonville was not a neutral employer. Local 223 also contends that the evidence fails to prove that its picketing of Atlas of Jacksonville was for an illegal purpose. In addition, the union submits that the court's instructions to the jury enlarged the stated illegal objectives of the statute so as to include lawful objectives. And finally Local 223 contends that the damages awarded were excessive.

In order for an employer who is the subject of a secondary boycott to avail itself of the protection afforded by the statute, it must be neutral and not affiliated or allied with the primary employer. The secondary employer must be, in the words of Senator Taft, the sponsor of the legislation, "wholly unconcerned" in the dispute between a primary employer and his employees. This neutrality of the secondary employer is destroyed and it is deemed to be an ally of the primary employer for the purpose

of section 8(b) (4) where there is actual common control exemplified by domination of the secondary by the primary employer or an overlapping of management functions and not merely potential common control inherent in common ownership.[3] NLRB v. Milk Drivers & Dairy Employees Local 584, 341 F.2d 29 (2 Cir. 1965); Miami Newspaper Pressmen's Local 46 v. NLRB, 116 U.S.App. D.C. 192, 322 F.2d 405 (1963); Truck Drivers & Helpers Local Union 728 v. Empire State Express, Inc., 293 F.2d 414 (5 Cir. 1961); Bachman Machine Co. v. NLRB, 266 F.2d 599 (8 Cir. 1959); Local 24 Int. Bro. of Teamsters, etc. v. NLRB, 105 U.S.App.D.C. 271, 266 F.2d 675 (1959); J. G. Roy & Sons v. NLRB, 251 F.2d 771 (1 Cir. 1958); NLRB v. Denver Bldg. & Constr. Trades Council, 219 F.2d 870 (10 Cir. 1955).

The record reveals numerous facts bearing on the issue of whether Atlas of Miami exercised the necessary control over the business affairs of Atlas of Jacksonville. Atlas of Miami owns 100 percent of the stock of Atlas of Jacksonville and the two corporations have an identical Board of Directors and identical officers:[4] Goodwin Salkoff—president and director, Gladys Salkoff—secretary-treasurer and director, Benjamin Salkoff—vice president and director. The two corporations make different products, have only one common customer, and only about 3½% of the gross business of Atlas of Jacksonville is with Atlas of Miami. Although Atlas of Jacksonville advertises separately and pays for its own advertising, Atlas of Miami has loaned Atlas of Jacksonville equipment and money without security and without corporation meetings to authorize same. President Goodwin Salkoff lives in Miami and is not paid a salary as president of Atlas of Jacksonville. Only one employee, Mr. Marion Robert Renfroe, has been interchanged between

3. Overstreet v. Southern Ry. Co., 371 F.2d 411 (5 Cir. 1967), although not concerned with a secondary boycott suit, indicates that even though one corporation owns the entire stock of another corporation, it does

not necessarily control the operation of the owned corporation.

4. The record does not clearly show such identity, but both parties in their briefs admit this fact to be true.

the two corporations. Renfroe was transferred from Atlas of Miami in 1960 and installed as Assistant Manager of Atlas in Jacksonville. In 1962 he was promoted to General Manager. Renfroe holds his job at the will of the corporation and has the responsibility for hiring and firing Jacksonville employees. Renfroe calls the president in Miami at least once or twice a week. In fact when the pickets appeared, he immediately called Salkoff and kept in touch with him by telephone throughout the picketing. President Salkoff travels to Jacksonville at least once each month for a 1 to 3 day visit and Atlas of Jacksonville pays his hotel bill while he is in Jacksonville. During his stay at Atlas of Jacksonville he would discuss business with Renfroe, speak to and instruct the employees, and visit job sites.

Several cases have been before the courts with factual circumstances quite similar to those outlined above. In J. G. Roy & Sons v. NLRB, supra, J. G. Roy & Sons Co. (Roy Construction) and Roy Lumber Co. (Roy Lumber) were owned by the five Roy brothers. All five brothers constituted the Board of Directors of Roy Construction but only four were directors of Roy Lumber. The brothers were also the officers of both companies but no brother was an officer in both. This common ownership produced potential common control of the two corporations but the court found that such control was never actually exercised. There was no substantial evidence of interference by the officers of one corporation in the affairs of the other; separate offices and records were kept; there were no common supervisors or employees; and each corporation did its own hiring and firing. In the absence of actual common control the two corporations were found not to be allies. In Bachman Machine Co. v. NLRB, supra, Bachman was president and majority stockholder of both Bachman Machine Co. and Plastics Molding Co. The officers and directors of both companies were members of the Bachman family. However, each company maintained its own books and

records; there was only one common employee, a bookkeeper, and no common supervisors; no employees were interchanged. Bachman hired Mr. Robert McDorman as general manager of Plastics to direct and control its operations. McDorman was given full authority as manager including the power to hire and fire employees of Plastics. Bachman, however, retained control of labor relations at Plastics. The court found that retention of this limited amount of control was not sufficient to make Plastics an ally of Bachman, because mere control over labor policies and decisions did not amount to actual control or management. In Miami Pressmen's v. NLRB, supra, Knight Newspapers, Inc., which published the Detroit Free Press, owned all the stock of the Miami Herald Publishing Co. The two corporations had a number of common officers and directors: John Knight, president and director of both; James and Clara Knight, directors of both. However, James Knight served as general manager of only the Miami Herald while Henry Weidler occupied the same position for Free Press. The court found that these two men had full authority with respect to their newspapers and operated them separately. Although the Knight family could have exercised their potential control over the affairs of Free Press, it chose not to do so. Therefore the court found that Free Press was a neutral under the secondary boycott provisions of the NLRA.

In finding that Local 223 had engaged in an unlawful secondary boycott the jury necessarily found from the evidence that Atlas of Jacksonville was not under the domination or control of Atlas of Miami, and therefore the jury concluded that Jacksonville was a neutral employer. The union's motions for a judgment notwithstanding the verdict, or for a new trial were denied by the district court. Local 223 contends that such motions should have been granted because it submits the evidence does not support a finding of neutrality on the part of Atlas of Jacksonville. The record indicates that the strongest insistence

of Local 223 in the trial was that Atlas of Jacksonville and Atlas of Miami were so closely allied that they were identical and constituted a single employer, and therefore, Atlas of Jacksonville could not be a neutral employer. Indeed, we gain the impression from the record that such contention was its chief defense. Our review of a jury verdict is limited by the Seventh Amendment [5] and under this constitutional prohibition we are not permitted to reweigh the evidence. Consequently, if there is any evidence in the record to support the jury's verdict, such verdict must stand. Myers v. Reading Co., 331 U.S. 477, 67 S.Ct. 1334, 91 L.Ed. 1615 (1945); Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944); Blount Bros. Corp. v. Reliance Ins. Co., 370 F.2d 733 (5 Cir. 1967); Spach v. Monarch Ins. Co., 309 F.2d 949 (5 Cir. 1962); Continental Cas. Co. v. Holmes, 266 F.2d 269 (5 Cir. 1959); Pennsylvania Thresherman & Farmer's Mut. Cas. Ins. Co. v. Crapet, 199 F.2d 850 (5 Cir. 1952).

The facts in the instant case clearly show potential common control through stock ownership and identical directors and officers. Even though there is evidence in the record of actual control of Atlas of Jacksonville by Atlas of Miami in that President Salkoff kept in constant touch with Renfroe either by telephone or regular visits, the evidence clearly shows that Renfroe was given authority over and responsibility for the affairs of Atlas of Jacksonville. At best the evidence is capable of supporting both the inference that Atlas of Miami exercised actual control over Atlas of Jacksonville and the inference that such actual control was lacking. Therefore, we find that the record contains an evi-

dentiary basis for the jury's conclusion that Atlas of Jacksonville was a neutral. We cannot substitute our judgment for that of the jury. Tennant v. Peoria & Pekin Union Ry.; supra.

Since there is ample evidence to support the jury's verdict, as it relates to the conclusion that Atlas of Jacksonville was a neutral, the trial judge properly and justifiably denied the union's motion for a judgment notwithstanding the verdict and for a new trial on the issue of neutrality. See Pennsylvania Thresherman & Farmer's Mut. Cas. Ins. Co. v. Crapet, supra.

In addition to the requirement of neutrality on the part of the secondary employer, the union must engage in unlawful conduct, described by the statute as inducing employees to strike or refuse to work or coercing the employer. See International Bhd. of Elec. Workers, Local 501 v. NLRB, 341 U.S. 694, 71 S. Ct. 954, 95 L.Ed. 1299 (1951); Burr v. NLRB, 321 F.2d 612, 617–618 (5 Cir. 1963); NLRB v. Truck Drivers & Helpers Local 728, 228 F.2d 791 (5 Cir. 1956); Penello v. International Longshoremen's Ass'n., D.C., 227 F.Supp. 164 (Md.1964). The record contains ample evidence that Local 223's picketing of Atlas of Jacksonville was to induce Atlas of Jacksonville's employees to refuse to report for work at the Jacksonville plant, and in finding that the union had violated the Act, the jury found that Local 223 had engaged in such unlawful conduct.

Lastly, the statute requires that the object of the unlawful activity must be to force the secondary employer to cease doing business with any other person, including but not limited to the primary employer,[6] or to force the primary em-

5. U.S.Const. Amend. VII:
"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

6. National Maritime Union v. NLRB, 120 U.S.App.D.C. 299, 346 F.2d 411 (1965); NLRB v. Milk Drivers & Dairy Employees, 341 F.2d 29 (2 Cir. 1965); Miami Newspaper Pressmen's Local 46 v. NLRB, 116 U.S.App.D.C. 192, 322 F.2d 405 (1963); Local 450, International Union of Operating Eng'rs v. Elliott, 256 F.2d 630 (5 Cir. 1958); Retail Fruit & Vegetable Clerks Union Local 1017 v. NLRB, 249 F.2d 591 (9 Cir. 1957).

ployer to recognize or bargain with an uncertified labor union.[7] To restate these statutory provisions in the context of the factual situation before us: If Local 223 induced the employees of Atlas of Jacksonville to cease working with the object of forcing Atlas of Jacksonville to cease doing business with Atlas of Miami or forcing Atlas of Jacksonville to cease doing business with any other person, or induced the employees of Atlas of Jacksonville to cease working with the object of forcing Atlas of Miami to recognize or bargain with Local 223, the union has violated the Act.

The determination of the union's objective or objectives in picketing Atlas of Jacksonville is a factual one. The evidence may disclose that the union entertained several objectives but a violation of section 8(b) (4) is established if only one of those objectives is unlawful. NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); NLRB v. Building & Constr. Trades Council, 359 F.2d 62 (3 Cir. 1966); NLRB v. Truck Drivers & Helpers Local 728, 228 F.2d 791 (5 Cir. 1956); Amalgamated Meat Cutters, Local 88 v. NLRB, 99 U.S.App.D.C. 24, 237 F.2d 20 (1956).

The evidence adduced at trial established that the ultimate objective of the picketing was to force Atlas of Jacksonville to put pressure on Atlas of Miami to settle its labor dispute with Local 223,[8] and it was inferable from all the facts and circumstances surrounding this case that Local 223 intended to accomplish that ultimate objective by forcing a cessation of business between the two companies.[9] Since section 8(b) (4) clearly prohibits secondary activity intended to force a neutral employer to cease doing business with the primary employer, the only question before us is

---

7. Truck Drivers & Helpers Local 728 v. Empire State Express, Inc., 293 F.2d 414 (5 Cir. 1961); NLRB v. Int. Bro. of Teamsters Local 182, 219 F.2d 394 (2 Cir. 1955); NLRB v. Chauffeurs, Teamsters, Warehousemen & Helpers Local Union No. 135, 212 F.2d 216 (7 Cir. 1955).

8. Mr. Renfroe, Manager of Atlas of Jacksonville testified:
 "Q. Did you have any conversation with Mr. Session?
 "A. Yes sir. I asked him what he was doing up here in Jacksonville with pickets on me, and he said well, as soon as they signed up in Miami it would be over with.
 "Q. Did he say who he was referring to by 'they'?
 "A. Well, speaking of Atlas of Miami."
 * * * * *
 "The following day I went back out there and asked him was he going home over the weekend, and he said he didn't know whether he would go home over the weekend, and that he may have to get him an apartment and stay up here if Atlas of Miami didn't sign a contract with them down there."
 Mr. Robert H. Love, employee of Atlas of Jacksonville testified:
 "A. Yes, we talked of what the pickets was [sic] doing there and when they would come down; and he told me as soon as they signed a collective bargain-

ing agreement with Local 223—that is Atlas of Miami—they could come down.
 "Q. A collective bargaining agreement such as—the same type you had here with Local 435?
 "A. Yes sir."

9. Atlas of Jacksonville's complaint alleged that the illegal object of Local 223 was to force the cessation of business between Atlas of Jacksonville and various companies not including Atlas of Miami. However, the trial court's instructions to the jury did not specifically advise the jury that forcing Atlas of Jacksonville to cease doing business with any person other than Atlas of Miami was an illegal object, but only instructed the jury that forcing Atlas of Jacksonville to cease doing business with Atlas of Miami was illegal. Atlas of Jacksonville objected to this omission in the court's instructions, but did not cross-appeal on this issue. Its motion to permit the filing of cross-assignments of error was denied by this Court.
 The record discloses that evidence was adduced tending to show that an object of the union's picketing was to interfere with the business relationship between Atlas of Jacksonville and Atlas of Miami, and the court did not err in instructing the jury on that point. Any defect in the pleadings was waived by the union's failure to object to the admission of evidence. Rule 15(b), F.R.Civ.P.

whether there was sufficient evidence to support the verdict. After a careful review of the record, we conclude that the evidence is adequate to permit the jury to conclude that the object of the picketing was to force a cessation of business between Atlas of Jacksonville and Atlas of Miami.

██ Local 223 also asserts that the district court's charge to the jury was too vague and general in that it did not adequately inform the jury that a violation of section 8(b) (4) could only be established if an object of the picketing was to force a cessation of business. The union contends that under the charge the jury could have concluded that the mere picketing of Atlas of Jacksonville to force Atlas of Miami to settle its labor dispute was illegal. We have carefully reviewed the entire charge and find the contention without merit. Read in its entirety, and viewed against the background of all of the evidence adduced at the trial, we believe the charge properly apprised the jury that the burden was on Atlas of Jacksonville 'to prove by adequate and sufficient evidence that an object of the picketing was to force Atlas of Jacksonville to cease doing business with Atlas of Miami in order for the jury to be able to find that the union had violated section 8(b) (4). While the charge might have been given in more precise terms, we do not believe the charge is so inadequate as to require reversal.

 The final question raised by the appellant concerns the award of damages. Section 303 of the NLRA, 29 U.S.C. § 187, permits any person injured in his business or property as a result of a section 8(b) (4) violation to bring suit to recover the damages he has sustained plus the costs of the suit. The statute is compensatory in nature, Local 20, Teamsters, etc. v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); Kreshtool v. International Longshoreman's Ass'n., 242 F.Supp. 551 (Del. 1965); Navios Corp. v. National Maritime Union, 236 F.Supp. 657 (E.D.Pa. 1964), aff'd 359 F.2d 853 (3 Cir. 1966),

and damages may only be recovered for actual losses sustained as a result of the unlawful secondary activity. While the employer must prove that he has sustained some injury to his business or property, he need not detail the exact amount of damages suffered. It is sufficient if the evidence supports a just and reasonable approximation. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

In the instant case, Atlas of Jacksonville sought the following items of damage: the added costs incurred in subcontracting out several construction jobs, overtime pay required to catch up on work delayed by the picketing, photographs taken of the pickets for use in legal proceedings, a portion of the salary of an employee rendered non-productive as a result of the picketing, utility bills and a percentage of other overhead costs. Atlas of Jacksonville also sought certain legal expenses incurred in its attempt to end the work stoppage of its employees. There is no dispute as to the propriety of the damages relating to the subcontracting costs or the overtime wages. Local 223 does, however, assert that Atlas of Jacksonville is not entitled to overhead expenses or utility bills because Atlas of Jacksonville did not suffer any loss of business as a result of the picketing.

Overhead expenses are the fixed costs of operation which do not fluctuate directly with the productive business of the company. When production is reduced these costs continue and are not offset by income derived from or attributable to productive labor. Thus, overhead expenses are recoverable where the productive labor or output of the employer is reduced below its normal level as a result of the unlawful activity of the union. United Elec., Radio & Mach. Workers v. Oliver Corp., 205 F.2d 376, 387–389 (8 Cir. 1953); International Union of Operating Eng'rs v. Dahlem Constr. Co., 193 F.2d 470, 472 (6 Cir. 1951); Structural Steel & Ornamental Iron Ass'n v. Shopmen's Local Union, 172 F.Supp. 354 (N.J.1959). Thus, Atlas of

Jacksonville may recover overhead expense allocable to lost income which would have been generated by productive labor which was halted by the picketing. United Elec., Radio & Mach. Workers v. Oliver Corp., supra. This recovery of overhead costs is limited to those costs not compensated for by other elements of damages or income derived from the normal course of business.

At trial, Atlas of Jacksonville did not prove any loss of business as a result of the picketing. Work halted by the picketing was either subcontracted out or made up through overtime. The costs of subcontracting and overtime are proper elements of damage and are recoverable. Thus, the added costs of these jobs and the original contract price were obtained by Atlas. The contract price included the overhead costs allocable to the labor necessary to complete the jobs. Therefore, in recovering the added costs of subcontracting and overtime, Atlas of Jacksonville was made whole, except to the extent additional overhead costs were incurred as a result of the picketing. There was no proof of such added overhead costs. Consequently, the district court erred in admitting the evidence of overhead costs and in permitting the jury to consider them in determining damages.

Since the inclusion of overhead costs in the damage award requires us to reverse and remand this case for a new trial as to damages, we do not reach the other damage questions. Instead we will only lay down a few guidelines to aid the district court.

Since section 303 is purely compensatory, all elements of damages must be directly related to or caused by the unlawful secondary activity. Thus, long distance telephone calls may be recovered only if they are attributable to the picketing, and salaries of employees who did not refuse to work may be recovered only to the extent that these employees were rendered unproductive as a result of the picketing.

In addition, costs of reasonable legal action taken by Atlas of Jacksonville to effect a resumption of work may be recovered.[10] Local Union 984 v. Humko Co., 287 F.2d 231 (6 Cir. 1961); Construction & Gen. Laborers, Local Union No. 438 v. Hardy Eng'rs & Constr. Co., 354 F.2d 24 (5 Cir. 1965). Such damages are not to be limited to attempts to merely remove the pickets, as the union contends, but include the costs of any reasonable legal action designed to bring about a resumption of work. The costs of such legal proceedings which follow directly from the illegal activity of a union are clearly within the purview of section 303, and we can find no meaningful distinction between reasonable recourse to the state court and similar action with the NLRB.

Finally, we come to the proper amount of damages to be awarded for the legal proceedings. The parties stipulated during trial that $35.00 per hour was a reasonable fee for the attorney's time for such work. Testimony of counsel indicated that 22½ hours were spent in the two legal proceedings commenced by Atlas of Jacksonville. That would allow Atlas of Jacksonville to recover $787.50. However the record reveals that Atlas was billed for only $559.20. In Aircraft & Engine Maintenance Employees, Local 290 v. I. E. Schilling Co., 340 F.2d 286 (5 Cir. 1965) we held that a jury could not award more than the exact amount spent for attorney's fees. This limitation on recovery comports with the general requirement that only compensatory damages are recoverable. Accordingly, Atlas of Jacksonville is entitled to recover only those attorney's fees actually incurred.

The judgment of the district court as to liability is affirmed, but as to dam-

---

10. It should be noted that attorney's fees, in themselves, are not recoverable. They are only recoverable as an element of the damages inflicted by the illegal secondary activity. Thus, the attorney's fees involved in prosecuting this suit may not be recovered as they are not a loss or expense incurred as a result of the picketing.

ages the judgment is reversed and the case is remanded for a new trial solely on the issue of the amount of damages Atlas of Jacksonville is entitled to recover.

Affirmed in part, reversed and remanded in part.