**AMERICAN POTASH & CHEMICAL CORPORATION, Plaintiff,**

v.

**UNITED ASSOCIATION OF JOURNEY-MEN AND APPRENTICES, PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, LOCAL UNION NO. 714, Defendant.**

**No. EC 6721–K.**

United States District Court
N. D. Mississippi, E. D.
Oct. 15, 1969.

Richard B. Booth, Aberdeen, Miss., Alex A. Alston, Jr., Jackson, Miss., for plaintiff.

Dixon L. Pyles, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, District Judge.

Plaintiff, American Potash and Chemical Corporation (AMPOT), has brought suit for damages against defendant, United Association of Journeymen and Apprentices, Plumbing and Pipefitting Industry of the United States of America and Canada, Local Union No. 714 (Local 714), charging that Local 714 conducted an illegal, secondary boycott, causing work stoppage, at AMPOT's chemical plants at Hamilton, Mississippi.[1]

Jurisdiction rests upon § 303 of the Labor Management Relations Act, as amended, 29 U.S.C. § 187.[2] That statute gives a right of action for damages to anyone injured in his business or property by any union activity which constitutes an unfair labor practice under 29 U.S.C. § 158(b) (4) (B).[3] The complaint alleged that from March 8, 1967, to March 17, 1967, Local 714 picketed a pipefitter contractor, R. E. Wooten, d/b/a West Point Machine Shop (Wooten) who did not employ union labor, while Wooten employees were performing maintenance work at AMPOT's premises, thereby causing union employees of AMPOT's construction contractors to leave their jobs. AMPOT alleged that an object of the picketing was to force AMPOT to cease doing business with Wooten, and also to force C. F. Braun Construction Company (Braun), a construction contractor, to cease doing business with AMPOT for the purpose of requiring the latter to cease business relations with Wooten. Local 714 admitted the fact of the picketing, asserting that it had a labor dispute with Wooten, but denied that its activity under the circumstances constitut-

---

1. Joseph P. Josey, business agent for Local 714, who was also joined as defendant in the original action, was previously dismissed by the court upon a holding that only labor organizations, and not individual persons, are suable in a § 303 action.

2. "(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b) (4) of this title.

(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

3. "§ 158. Unfair Labor Practices.
   *    *    *    *    *
   (b) It shall be an unfair labor practice for a labor organization or its agents—

*    *    *    *    *

(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike * * *; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   *    *    *    *    *
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

ed an unfair labor practice. It is conceded that the business operations of both AMPOT and Braun at the situs of this controversy were activities affecting commerce, and that Local 714 was a labor organization, within the context of 29 U.S.C. § 187.

The AMPOT plants at Hamilton are two large chemical plants located side by side in the same compound but separated by a fence. Access to both plants is by a county road running east and west, which intersects U. S. Highway 45 just east of the two plants. These plants, constructed at different times, had entirely separate administrations and employees and produced different chemical output. The easternmost plant is known as the Pigment Plant; the plant to its west is called the Electrolytic Plant. Construction work was still under way at the Pigment Plant where Braun, an independent contractor performing a $3,-500,000 cost-plus contract, was installing a chlorinator, oxidation line, and related items. Braun employed, among others, pipefitters who were members of Local 714, as were employees of various Braun subcontractors engaged in the new construction. Employees of Braun and its Subcontractors used a particular gate known as Braun gate, which was separate from gates used by AMPOT's production and maintenance workers and maintenance subcontractors.

Both the Pigment and Electrolytic Plants require considerable maintenance, including pipefitting, which is done in part by AMPOT's own employees and in part by several outside contractors.

Wooten and various other maintenance contractors are very often present in one or both of AMPOT plants doing conventional maintenance work. The employees of Wooten and other maintenance contractors, when present at the Pigment Plant, worked alongside and in the same plant areas as Braun personnel. With the exception of Wooten's employees, all pipefitters used by maintenance contractors were Local 714 members.

On Wednesday, March 8, 1967, the date when the picketing began, both Braun and Wooten were working in the Pigment Plant under their respective contracts with AMPOT. On that date Local 714's business agent, Joseph P. Josey, entered the Pigment Plant and ascertained from his union steward that Wooten was using non-union pipefitters for maintenance work in the Pigment Plant. Josey thereupon left the plant, and at 9:45 a. m. began to picket by walking back and forth in front of the main Pigment Plant gate.[4] He walked along the county road from just west of the Braun gate past the main Pigment gate, two-thirds of the way to the Electrolytic gate, and carried a sign which read:

"PUBLIC NOTICE
UNION MEN NOT EMPLOYED BY
WOOTEN MACHINE SHOP

— — — — —

PLUMBERS AND STEAM FITTERS
LOCAL UNION NO. 714"

At 10 a. m. all members of Local 714 walked off the job; by 10:30 a. m.

---

4. There are five entrances to the AMPOT compound; all are located on the north side of the east-west county road running along the front of the compound. Listed from east to west, these entrances are: (1) the Parathion gate, which is magnetically operated, usually kept locked, and used by employees of the Parathion Plant, a portion of the Pigment Plant; (2) the contractors' entrance to the Pigment Plant, referred to as Braun gate, and used by Braun's and its subcontractors' new construction employees; (3) the main entrance to the Pigment Plant, known as the Pigment gate, used by AMPOT's employees and maintenance contractors' workers employed in the Pigment Plant; (4) the main entrance to the Electrolytic Plant, known as the Electrolytic gate, and used by AMPOT's employees and maintenance contractors' workers employed in the Electrolytic Plant; and (5) the contractors' gate to the Electrolytic Plant used by new construction contractors' workers in the Electrolytic Plant. No new construction was underway in the Electrolytic Plant at the times relevant here.

most of the other crafts present in the Pigment Plant had also left the job. With other Local 714 members replacing Josey, the picketing continued until about 3:45 p. m. that day. On the following three work days, and in accordance with Josey's instructions, picketing resumed at the same place and area, commencing daily at about 7 a. m. and continuing until 3:30 p. m.[5] Josey instructed the pickets, who walked singly for each shift, to inform all inquirers to read the sign or otherwise to call Josey, with the less said the better.

From March 9 through March 15, Wooten's pipefitters worked only in the Electrolytic Plant and not at all in the Pigment Plant. Yet, Local 714 continued to picket the main Pigment gate, walking very close to the Braun gate. In fact, no picket was ever placed at the Electrolytic gate which was, from March 9 through March 15, openly and plainly used by Wooten and his employees. The Wooten work crew did not return to AMPOT after March 15; nevertheless, Local 714 continued its picketing through March 17, or for two days after the Wooten crew was no longer on the job. Josey withdrew the picket when he was informed of this fact by union associates in New Orleans, Louisiana.

On the afternoon of March 8, a Braun official, Elliot Condon, complained to Josey about the picketing. Josey then contacted the business agents of the other crafts who had walked off their jobs at AMPOT and told them that his union had no dispute with anyone but Wooten. The other crafts returned to work the following morning.

On the evening of March 10, Josey called a meeting of all Local 714 members working for Braun and its subcontractors and told them to "man the work". This appeal was unavailing as no Local 714 members returned to the job site until March 18, the day following removal of the picket. Braun's construction work was thus shut down for eight working days, but there was no work stoppage by AMPOT's own employees in either chemical plant.

On March 14, at 12:30 p. m., the fifth day of picketing, the picket line was moved eastward to the intersection of U. S. Highway 45 and the county road. The picket line remained at that point through the afternoon of March 17, thereby forcing all persons having business dealings with, or working anywhere on, the AMPOT compound to cross it.

On March 10, Braun filed an unfair labor practice charge against Local 714 with the N.L.R.B. Regional Office in Memphis charging that the labor organization was coercing Braun to force AMPOT to stop doing business with Wooten. On March 14, an N.L.R.B. agent, Perry G. Hyde, arrived to investigate the charge; by letter to Braun dated March 28, the N.L.R.B. Regional Director declined to issue a complaint against Local 714. Defendant concedes that the refusal to issue a complaint is not res judicata and does not constitute collateral estoppel. Aircraft & Engine Maintenance, etc., Local 290 v. I. E. Schilling Co., 340 F.2d 286 (5 Cir. 1965).

On March 21, AMPOT filed the present action in federal district court. Local 714 asserts several defenses to this action which, if good, would bar AMPOT's claim. The principal contention is that its picketing was directed solely at Wooten, the employer with whom it had a labor dispute, and that such picketing was primary activity and, therefore, did not violate § 303.

■ The demarcation between primary and secondary picketing, especially at a common situs of employment, is seldom clearly defined so that each case must be decided on its own distinct facts. The paramount judicial purpose is to balance "the dual congressional objectives of preserving the right of labor

---

5. March 11 and 12, Saturday and Sunday, were not work days and are thus excluded from computation.

organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." National Labor Relations Board v. Denver Building & Construction Trades Council et al., 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). In attempting to balance rights of neutral employers with rights of labor unions, the courts have established certain rules for distinguishing between lawful primary strikes and unlawful secondary strikes. Concisely stated, a strike is lawful if its *object* is to exert pressure on the primary employer, i. e., the employer with whom the union has a labor dispute.[6] Where the object of a strike is lawful, the mere fact that it incidentally involves neutral, or secondary, employers is immaterial.[7] If, however, *one* of the objects of a strike is to involve neutral employers, then the entire strike is unlawful.[8] In many cases, particularly where two or more employers are working at a common site, as here, close questions may arise as to the object of the strike. Where evidence as to the objects of a strike is equivocal, the courts have adopted certain standards as an evidentiary aid for determining the objects. Known as the Moore Dry Dock doctrine,[9] these criteria, if complied with,

establish the presumptive validity of the objects of a strike.[10] Before courts will apply the Moore doctrine, however, evidence of the objects of a strike must be equivocal.[11] Moreover, even under the Moore Dry Dock doctrine, the union must conduct its picketing so as to minimize its impact on the secondary employer, and the doctrine can have no application where the union "deliberately enmeshes secondary employers and employees in the dispute." National Labor Relations Board v. Highway Truckdrivers and Helpers Local No. 107, etc., 300 F.2d 317 (3 Cir. 1962).

At the outset, it is uncontradicted that at no time did Local 714 ever picket Wooten's own shop, which was easily identifiable and located on a business street at West Point. Defendant claims that it was forced to picket Wooten, the primary employer, at AMPOT plants because that was the only work situs where Wooten was performing "pipe work", the type of labor over which Local 714 had jurisdiction. However, the facts were that Wooten performed considerable pipe work at his West Point shop and had employees working at the West Point shop throughout the entire period of picketing at AMPOT. Defendant's failure to negotiate with Wooten or even to inquire whether Wooten did pipe work at the West Point shop is a circumstance

6. Superior Derrick Corporation v. National Labor Relations Board, 273 F.2d 891 (5 Cir. 1960).

7. National Labor Relations Board v. General Drivers, Warehousemen and Helpers, etc., Local 968, 225 F.2d 205 (5 Cir. 1955); Seafarers International Union of North America, etc. v. National Labor Relations Board, 105 U.S.App.D.C. 211, 265 F.2d 585 (1959).

8. Sheet Metal Workers International Association, Local Union No. 223, AFL-CIO v. Atlas Sheet Metal Company of Jacksonville, 384 F.2d 101 (5 Cir. 1967); National Labor Relations Board v. Truck Drivers & Helpers Local Union No. 728, etc., 228 F.2d 791 (5 Cir. 1956).

9. Sailors' Union of the Pacific, 92 N.L.R.B. 547 (1950). The National Labor Relations Board there set out four standards

for determining whether such picketing is presumptively valid primary activity: (1) that the picketing be limited to times when the situs of the dispute was located on secondary premises; (2) that the primary employer be engaged in his normal business at the situs; (3) that the picketing take place reasonably close to the situs; and (4) that the picketing clearly demonstrate that the dispute was only with the primary employer.

10. Superior Derrick Corporation v. National Labor Relations Board, supra; Local 761, International Union of Electrical, Radio and Machine Workers, AFL-CIO v. N. L. R. B., 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

11. National Labor Relations Board v. Northern California District Council of Hod Carriers, etc., Local No. 185, 389 F.2d 721 (9 Cir. 1968).

indicating the union's unlawful object in picketing Wooten at AMPOT rather than at Wooten's own shop.[12]   Finally, the testimony revealed that even while performing the maintenance work at AMPOT, Wooten's employees regularly met at his shop at West Point each work day both in the morning before traveling to AMPOT and in the afternoon after returning.   Thus, Local 714 had a fair and reasonable opportunity to picket Wooten's shop in West Point at those times when pipefitter employees were present without involving Braun, AMPOT or any other neutral employer.

But assuming that Local 714 could not have picketed Wooten at his own shop, the question arises: Did Local 714 make a good-faith effort not to involve secondary employers when it picketed Wooten at AMPOT?   The preponderance of the testimony revealed that Local 714 did not picket the Electrolytic gate through which Wooten and his work crew customarily entered, but chose to picket the main Pigment gate and in very close proximity to the Braun gate. For three work days, March 9, 10 and 13, the union picketed outside the Pigment Plant although the Wooten crew was then working only in the Electrolytic Plant.   Small effort, if any, was made by the union to keep check on where Wooten employees were working on AMPOT premises, and the picket was not fashioned with that consideration in mind.   Also, by moving its picket line to the intersection of Highway 45 and the county road on March 14, the union allowed, even more broadly, its picket to influence anyone entering either of the plants by means of any entrance whatsoever.   Although the union asserts that it changed the picket under a misimpression that the county road was, in fact, AMPOT's private road, pressure against neutral employers was maximized, and not reduced, by this change.   The continuance of the picket

for two full days after Wooten had entirely finished the AMPOT work and left the compound is another significant factor.   These circumstances are inconsistent with a professed aim of the union to direct its picketing only at Wooten, as Josey testified.   "The facts speak more eloquently than the spoken words." National Labor Relations Board v. Truck Drivers & Helpers Local Union No. 728, etc., 228 F.2d 791 (5 Cir. 1956).

Even if the evidence in this case were deemed equivocal on the issue of the union's objects in its picketing, and thus ought to be measured by Moore Dry Dock doctrine, it is evident that at least the first and fourth requirements of that doctrine were not complied with.   As regards the first requirement, namely: that picketing be limited to times when the situs of the dispute was located on the secondary premises, Local 714 picketed the Pigment Plant for five days (including those days picketed from the highway intersection) while Wooten's pipefitters worked solely in the Electrolytic Plant, and for two days when they were present at neither plant. As regards the fourth requirement, namely: that the picketing clearly demonstrate that the dispute was only with the primary employer, Local 714's sign stated merely that Wooten did not employ union labor but it did not disclose that Local 714 had no dispute with Braun, AMPOT or the other employers. Nor did anyone who picketed make to his inquirers a full or adequate explanation as to the nature of the controversy.   Indeed, Josey's instruction was to the contrary, saying, in effect, that the less said the better and to refer all inquiries to him at his Columbus office. It is small wonder that all Local 714 members and most members of other crafts working at AMPOT walked off the job upon sight of the picket with no further explanation being given. Several delivery trucks refused to enter

**12.**  Aircraft & Engine Maintenance & Overhaul, etc., Local 290 v. Oolite Concrete Company, 341 F.2d 210 (5 Cir. 1965); National Labor Relations Board v. Building Service Employees International Union, Local No. 105, 367 F.2d 227 (10 Cir. 1966).

AMPOT premises after seeing the picket. Again, the initial reaction of such truck drivers demonstrates that neither the sign nor the persons picketing disclosed clearly that the dispute was solely with Wooten. A plain disclosure of that nature is absolutely essential to protect neutral employers from picketing directed at a primary employer. In Superior Derrick Corporation v. National Labor Relations Board, 273 F.2d 891 at 896–897 (5 Cir. 1960), Chief Judge Brown graphically stated:

> "A picket line is a potent instrument. It may, of course, be the means of obtaining wide publicity for the grievances, actual or supposed, of a union either representing or seeking to represent workers. Members of the public and employees of other employers are a legitimate object of that publicity. But in the context of the long and sometimes bitter history of the trades union movement, it has a special message of its own. To a loyal unionist it is both a spontaneous plea not to engage in any business activity with those behind the picket curtain and an instantaneous branding of 'unfairness' on those engaged in activity behind the picket line. * *
>
> The activity, including the picket line, must be conducted in such a way that the normal appeal of a picket line is overcome. It must be done so that all secondary employees will know that the primary union does not seek what the law forbids—pressure on the primary employer through pressure from the secondary employer because of concerted pressure of secondary employees on that secondary employer.
>
> * * * Neither signs nor papers nor pamphlets nor silence automatically insulate the activity."

We conclude from the evidence that Local 714 failed to disclose clearly whom it was picketing, and its actions did not overcome the normal appeal of the picket line. Local 714's conduct, falling far short of the Moore Dry Dock standards, cannot be considered as primary picketing protected by § 303. That AMPOT may have produced no direct evidence of an unlawful object by the union may not militate against our view, supported by all reasonable inferences, that the picketing was an unfair labor practice under § 303; the picketing activity plainly carried its own indicia of intent.[13]

■ Next, Local 714 urges, alternatively, that Wooten was not an independent contractor but an "ally" of AMPOT and, therefore, it had the right to picket AMPOT as well as Wooten. This argument would be valid only if the evidence showed actual common control exemplified by domination or an overlapping of management functions by AMPOT so as to strip it of the role of a neutral employer.[14] The business transactions between AMPOT and Wooten, neither of which had a financial or proprietary interest in the other, were evidenced by written document stating the relationship between the parties to be principal and independent contractor, and that Wooten was responsible for performance, at specified considerations, of the work contracted for. Wooten was to, and did, select, direct and control his employees, fixing their compensation and other terms of employment. All work done by Wooten was against written work orders issued by AMPOT and directly delivered to Wooten, who personally supervised his workers on the job without immediate control by AMPOT. Wooten's crew worked as and where directed by Wooten, devoting only part of their time to pipefitting maintenance at AMPOT's premises and at other times working at entirely different locations. The fact that AMPOT and Wooten's employees often worked side by side doing practically the same jobs and Wooten was on 24-hour call

---

13. National Labor Relations Board v. Erie Resistor Corp. et al., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

14. Sheet Metal Workers, etc. v. Atlas, supra, Fn. 8.

to perform AMPOT's maintenance work when needed does not destroy Wooten's status as an independent contractor; nor did the issuance of on-the-spot instructions by AMPOT personnel to certain of Wooten's employees, in instances when Wooten was not personally present to receive those instructions, operate to make Wooten's employees the employees of AMPOT.[15] Finally, defendant urges that this case should be governed by the "related work" rule, which is bottomed upon the premise that the construction industry is different from other industries, and that where picketing occurs at a construction site common to several employers whose employees are doing related work side by side, those employers should be treated as "allies" and not as independent contractors. The Fifth Circuit recently disposed of this argument in Markwell and Hartz v. National Labor Relations Board, 387 F.2d 79 (5 Cir. 1967), in which the Court held that the factor governing a § 303 action was the object, or objects, of the picketing, not the relatedness of the work. Judge Wisdom, although dissenting on other grounds, stated the rule with great clarity:

"[T]he Court [in Denver, supra] looked to the traditional legal concept of the relationship between a prime contractor and his subcontractors. The subcontractors are independent contractors whose employees are not the employees of the prime contractors. As separate legal entities, they are entitled to protection from secondary boycotts. The construction industry, therefore, is subject to the same restrictions as are other industries in regard to common situs picketing." (p. 87)

In Markwell the union had picketed the primary employer at his own premises, also involving his neutral subcontractors, whereas in the present case Local 714 picketed only at the premises of the neutral employer. Thus, the "related work" rule cannot save Local 714 from its unfair labor practice, which was precisely the kind of secondary activity proscribed by § 158(b) (4).

By its amended complaint, AMPOT sought recovery of $17,235 and an equal amount as punitive damages.[16] Since the picketing was without violence, punitive damages are not recoverable;[17] nor was there any proof of special costs allowable by statute. At trial the evidence showed no production loss by AMPOT, and plaintiff conceded its claim for direct loss, other than $1,000 attorney's fee paid for legal services rendered to remove the picket, was without merit. The attorney's fee, which was reasonably incurred, is recoverable.[18] The main element of claimed loss is an aggregate of $6,784.31 additional costs charged to plaintiff by Braun and previously paid, allegedly due to the eight-day work stoppage. Of that sum, the court allows, as validly established damages, $2,607.35 for machine and equipment rental accruing during Braun's work stoppage and the further sum of $243.62 for extra business insurance cost, both of which were direct contractual obligations of AMPOT. The court disallows other items, consisting mainly of salaries for Braun's super-

15. National Labor Relations Board v. Denver Building & Construction Trades Council, supra.

16. Items of actual damage were alleged to be (1) $13,500 expenses incurred by Braun for work stoppage during the picketing and chargeable to AMPOT under its cost-plus contract; (2) $1,000 attorney's fees expended by AMPOT for services in removing the picket and getting work resumed; and (3) $2,735 administrative costs incurred by AMPOT during the period of said work stoppage.

17. Local 20, Teamsters, Chauffeurs & Helpers Union, etc. v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).

18. Sheet Metal Workers, etc. v. Atlas, supra; Local Union 984, etc. v. Humko Co., etc., 287 F.2d 231 (6 Cir. 1961); Gulf Coast Building & Construction Trades Council v. F. R. Hoar & Son, 370 F.2d 746 (5 Cir. 1967).

visory personnel, because AMPOT's contract, (Contract ¶ 10(B)), obligated it only to pay such expense "for the actual hours, including travel time, spent on the work, or in connection with it." The evidence does not disclose that Braun's supervisory personnel had any work to perform during the period of the shutdown; and if AMPOT has paid Braun's claim therefor, it was no less than a voluntary contribution, not recoverable here.

The total allowable damages amount to $3,850.07, for which judgment shall be entered against defendant.